## SCHARFELD v. RICHARDSON.

### No. 7890.

United States Court of Appeals for the District of Columbia.

Decided Nov. 23, 1942.

Mr. H. L. McCormick, of Washington, D. C., with whom Mr. Clair L. Stout, of Washington, D. C., was on the brief, for appellant.

Mr. Walter M. Bastian, of Washington, D. C., for appellee.

Before STEPHENS, VINSON, and RUTLEDGE, Associate Justices.

VINSON, Associate Justice.

A jury in the Municipal Court, after finding appellant's dog, "Popo", to have been the perpetrator of a fatal assault upon "Little Bits", the pet Pomeranian owned by Mrs. Emily W. Erck, and that the appellant had been apprised of Popo's malevolent propensities, returned a verdict for Mrs. Erck in the sum of $200.00. Since the judgment Mrs. Erck has died, and there has been substituted in her place as appellee William E. Richardson, executor and trustee of her estate. Appellant contends that appellee is not entitled to recover for the loss of Little Bits, relying upon the admitted fact that Little Bits, at the time of its death, was not wearing and never had been provided with a tax tag as prescribed by Title 20, Sections 915 et seq., of the District of Columbia Code (1929).[1]

The statute, enacted in 1878, provides for the levy of an annual tax upon "all dogs owned or kept in the District of Columbia";[2] the issuance by the collector of a "tax tag" upon the payment thereof;[3] the impoundment and disposal of all dogs found running at large without the tax tag;[4] the civil liability of the owner of a "recorded" dog for any damage done by the same;[5] the adornment of all dogs with a certain collar containing the said tag and prescribing penalties for the failure thereof;[6] and certain penalties for the removal or molestation of these collars or tax tags.[7] In addition, Section 918 declares:

"Any dog wearing the tax tag * * * shall be permitted to run at large within the District of Columbia, and any dog wearing the tax tag * * * shall be regarded as personal property in all the courts of said District, and any person injuring or destroying the same shall be liable to a civil action for damages * * *."

It is an established principle of the common law that a dog is personal property and that its owner may recover for a willful or negligent injury thereto,[8] and it has been deemed immaterial whether the injured dog had been licensed or taxed as prescribed by law.[9] It is in the discretion of the legislature, however, to delimit these property rights in a dog,[10] and appellant asks us to consider that Section 918 effects a deprivation of these rights to the extent that Little Bits cannot be regarded as personal property, and that no action can be predicated upon its destruction. Appellant contends that Congress in declaring that all dogs wearing the tax tag shall be regarded as personal property and that any person injuring the same shall be liable in a civil action for damages, by necessary implication, has changed the common law rule to the extent that any dog *not* wearing the tax tag is *not* personal property and that anyone injuring the same is *not* liable in damages.

The suggested construction would change the common law rule. No explicit provision for such a change is contained in the Act. The courts have consistently held legislation derogative of the common law accountable to an exactness of expression, and have not allowed the effects of such legislation to be extended beyond the necessary and unavoidable meaning of its terms. The presumption runs against such innovation. This is merely a familiar principle of statutory construction. We are mindful, however, of the caution with which this principle is applied whenever there is a suggestion that an adherence to the letter of the statute would defy an obvious legislative purpose or "lessen the scope plainly intended to be given to the measure."[11] Not only must we weigh

---

[1] Act of June 19, 1878, 20 Stat. 173, c. 323, as amended by the Act of June 30, 1902, 32 Stat. 547, c. 1332, and the Act of June 6, 1930, 46 Stat. 522, c. 411, § 1.

[2] D.C.Code (1929) Tit. 20, § 915.

[3] Id. at § 916.

[4] Id. at § 917.

[5] Id. at § 919.

[6] Id. at § 920.

[7] Id. at § 921.

[8] Sentell v. New Orleans & Carrollton R. R., 166 U.S. 698, 17 S.Ct. 693, 41 L. Ed. 1169; Mayor, etc., of City of Washington v. Meigs, 1 MacArthur 53, 8 D. C. 53, 29 Am.Rep. 578.

[9] Roos v. Loeser, 41 Cal.App. 782, 183 P. 204; Lacker v. Strauss, 226 Mass. 579, 116 N.E. 236, L.R.A.1917F, 434.

[10] Sentell v. New Orleans & Carrollton R. R., 166 U.S. 698, 17 S.Ct. 693, 41 L.Ed. 1169; Nicchia v. New York, 254 U.S. 228, 41 S.Ct. 103, 65 L.Ed. 235, 13 A. L.R. 826; Dickerman v. Consolidated R. Co., 79 Conn. 427, 65 A. 289, 8 Ann. Cas. 417.

[11] Jamison v. Encarnacion, 281 U.S. 635, 640, 50 S.Ct. 440, 442, 74 L.Ed. 1082.

the force and finality of the words employed in Section 918, but its effect should not be judicially determined apart from its context. It should be considered in association with other related declarations in the Act with a view to the legislative aims and purposes therein and the legislative history of the general subject matter. Guided by these directives, we find the Act to contain several positive indications inconsistent with appellant's construction.

In 1887, this court, in Murphy v. Preston,[12] construed Section 919. This Section reads:

"Any person owning any dog so recorded in the collector's office shall be liable in a civil action for any damage done by said dog to the full amount of the injury inflicted."

The plaintiff, there, argued that the Section dispensed with the common law requirement of *scienter* to establish the liability of an owner for the damage done by his dog. The court acknowledged that a strict interpretation of that Section supported the plaintiff's contention; but ruled that the common law necessity of proving *scienter* had not been modified, holding the provisions of the statute to be in derogation of the common law and thus subject to a strict construction.

After a "careful examination and comparison" of the previously existing regulations concerning dogs, this court stated it was satisfied that Congress had not designed the Act of 1878 to introduce any new principles of law:

"* * * the act announces no new principle of law on the subject. *The provision that dogs shall be considered, in such wise, personal property, that the owner may have an action against those injuring them, had already been recognized as the law by our courts.* Meig's Case, 1 MacArthur, 53 [8 D.C. 53, 29 Am.Rep. 578]. *Hence, section 4 of the act [§ 918] which declares that a person injuring or destroying a dog wearing a tag shall be liable in a civil action for damages to the owner of the animal, is only declaratory of the existing law, and must be construed according to common law principles.*

"* * * So, the provision in section 5 [§ 919], that the owner should be liable in damages for injuries caused by his dog, was already well recognized as the law. * * *"[13] [Italics supplied.]

When a statute, such as this, is of some sixty years' vintage, a contemporaneous construction and analysis of this sort is of particular persuasiveness on the question of legislative intent. It may be considered that Congress attached implied approbation to this construction when, in 1902, it made an addition to Section 918,[14] and left that Section unaffected in all material respects.[15] On the basis of the observations in the Murphy case, therefore, as well as the treatment of analogous statutes in other jurisdictions, we believe that the above admonition apropos of interpretative liberality in deference to obvious legislative intent does not pertain to the present legislation, and that the general rule of strict construction prevails.

It is an established rule of the common law that an owner may be liable in a civil action for the damage caused by his dog. Section 919 imposes this liability upon the owner of the "recorded" dog. Consistency would compel the appellant to argue that Congress, in declaring therein that the owner of a *recorded* dog should be liable in a civil action for damages caused by the same, by necessary implication, has changed the common law rule to the extent that any owner of a dog *not* recorded should *not* be so liable. The parallel of this reasoning with the reasoning advanced in support of the appellant's contention in respect of Section 918 is perfect. A comparison of these two sections is, therefore, especially indicative of the conclusion that appellant's contention cannot stand. These two sections are consecutive parts of the same Act, passed on the same day, worded with similar references to preceding sections, possessed of parallel phraseology, and obviously intended (as is the whole of the Act) to be read together. The similar structure and terminology must be given the same effect in the one as in the other. If this court should follow appellant's contention as to Section 918, it would experience difficulty in attaching a different in-

[12] 5 Mackey 514, 16 D.C. 514.

[13] Id., 5 Mackey at pages 519, 520, 16 D.C. at pages 519, 520. This opinion received a new affirmance in Bardwell v. Petty, 52 App.D.C. 310, 286 F. 772.

[14] Act of June 30, 1902, 32 Stat. 547, c. 1332.

[15] Bardwell v. Petty, 52 App.D.C. 310, 286 F. 772.

terpretation to Section 919, should the occasion arise. The discriminatory effects implicit in the latter instance need no extended delineation. If the roles of the principals in this tragedy had been reversed, with Little Bits the villain and Popo the victim, the appellant might very well have considered that the appellee had not exempted himself from civil liability by failing to provide Little Bits with a tax tag.

In addition, there are other evidences in the Act that make it plain that an unlicensed dog was not intended to lose its status as personal property. Section 917 provides that when an unlicensed dog is impounded, it may be redeemed by "the owners thereof" upon the payment of two dollars. While this two dollars is the monetary equivalent of the tax levy, the provision does not, in terms, or by any manner of implication, make the forfeiture thereof the payment of the tax, but rather a penalty and the price of redemption (the poundmaster not being entitled to instant reseizure as the dog would no longer be at large). More important, however, the use of the word "owners" and the provided power of redemption are too opposed to the concept of a complete absence of property rights to give the statute the force that appellant contends. The etymological association and the legal interdependence of the words "owners" and "property" make the conclusion inescapable that all property rights in an untagged dog were not intended to be and were not removed.

If the other construction be adopted, appellee has urged that foreign dogs, temporarily in the District, being necessarily without a license, would be subject to abuse and their owners entitled to no redress in our courts. Appellee does not go far enough, for under the appropriate conflicts rule, there being no tort where the injury occurred, the aggrieved owner would be unable to seek redress in any court.

There is still a further indication in the Act that the owners of untagged dogs were intended to have property rights therein. In Section 921, it is provided that any person who shall seize or molest "*any*

*dog*" while held or led by any person, or who shall bring "*any dog*" into the District to kill it, shall forfeit up to $20.00.

We have been unable to discover anything in the examination of this Act or in the legislative history of the subject matter thereof to indicate that Congress intended to affect the status of a dog in the respect contended.

The judicial treatment of similar statutes in other jurisdictions supports this position. In Alabama Great Southern R. Co. v. Wedgworth,[16] the court held that an Alabama statute [17] requiring a registration fee and identification tag, and declaring dogs so provided to be "property", did not deprive the plaintiff of a right to civil damages for a negligent injury to his unlicensed and untagged dog, and disavowed any construction of the statute which destroyed valuable pre-existing rights. In Chapman v. Decrow,[18] it was held that a Maine statute [19] requiring the registration and licensing of dogs and creating a civil liability for the killing of a dog so provided did not prevent the plaintiff's recovery for the destruction of his unlicensed and untagged dog. The construction of these statutes is especially significant in view of the fact that both contained a provision (absent in our own) making it the duty of certain officials to kill any dog found running at large without these licenses and tags. In State v. Fenske,[20] the court held that a Kansas statute [21] providing for a certain levy upon dogs and declaring that a dog which had been accordingly listed and valued should be considered personal property did not imply that failure to comply with its provisions destroyed a dog's classification as personal property for the purposes of larceny.

We have considered several cases where a construction in accordance with the appellant's argument has been applied, but in each instance the applicable legislation made plainly explicit that which appellant urges is necessarily implicit in our statute. Invariably these statutes contained positive provisions that no dog was to be entitled to the protection of the law unless placed upon the assessment rolls [22] or else

---

16 208 Ala. 514, 94 So. 549.

17 Gen.Acts (Ala.) 1919, p. 1077.

18 93 Me. 378, 45 A. 295, 74 Am.St. Rep. 357.

19 Public Laws of 1893 (Me.), c. 287.

20 144 Kan. 560, 61 P.2d 1368.

21 R.S. (Kan.) 79-1301 (1923).

22 Sentell v. New Orleans & Carrollton R. R., 166 U.S. 698, 17 S.Ct. 693, 41 L.Ed. 1169 ("* * * no dog shall be entitled to the protection of the law unless the same shall have been placed upon the as-

declared that it was lawful for *any* person to kill any dog not so provided either when found running at large [23] or whenever and wherever found.[24]

In the course of our inquiry into the merits of appellant's arguments, we have been measurably impressed by the consistency with which the courts have applied the strictest of constructions to any statute which seemingly modified the common law rule in respect of the property rights in a dog. In jurisdictions where the legislatures have provided that anyone could kill or cause to be killed an unlicensed or unregistered dog, the courts have held that these statutes did not extend to the situation in which the unlicensed dog was killed by another dog;[25] in which an unlicensed dog was negligently run over upon the public highway;[26] and in which the unlicensed dog was killed by someone other than those who the statute declared might kill the same.[27]

Apart from any aversion to the inhumane implications of the appellant's proposal, we are unable to find anything in the Act of 1878, the interpretation of similar state statutes, or the general judicial treatment of the subject matter which lends support thereto.

We have carefully examined the other alleged errors, and, in our view, they are not sufficient to authorize reversal.

The judgment is

Affirmed.

RUTLEDGE, Associate Justice (concurring).

I concur in Judge VINSON'S opinion, for the reasons stated therein and upon the following additional authority:

"This saga of Popo, malevolent pooch,
And Erck's Pomeranian pet;
Your etymological-legal approach
To canons of dog etiquette,
Persuade me that canines are property still
Whether licensed, unlicensed or tagged;
Not *ferae naturae*, or fair game to kill
So long as there's tail to be wagged." [28]

STEPHENS, Associate Justice (dissenting).

The question in this case is: Does the statutory provision that "any dog wearing the tax tag . . . shall be regarded as personal property in all the courts of said District, and any person injuring or destroying the same shall be liable to a civil action for damages"[1] mean that dogs not wearing a tax tag shall not

sessment rolls."); Duval v. Harvey, 148 La. 739, 87 So. 730.

[23] Brown v. Graham, 80 Neb. 281, 114 N.W. 153 (" * * * it shall be lawful for any person to kill any dog running at large on whose neck there is no such collar."); Jenkins v. Ballantyne, 8 Utah 245, 30 P. 760, 16 L.R.A. 689 (" * * * all dogs found running at large * * * not so registered and collared, shall be liable to be killed by any person.").

[24] McDerment v. Taft, 83 Vt. 249, 75 A. 276, 138 Am.St.Rep. 1083 (allowing any person to kill dogs that are unlicensed and uncollared as provided by law).

The case of Dickerman v. Consolidated Ry. Co., 79 Conn. 427, 65 A. 289, 290, 8 Ann.Cas. 417, has been offered as an exception to this proposition. The Connecticut law required dogs over six months to be registered, licensed, and collared, and provided a civil and criminal liability for injuring or killing a dog so equipped. The court held that there could be no recovery for the negligent killing of an unregistered dog. The opinion contained a history of the State's dog legislation, observing that continuously up until the passage of the Act involved, it had been provided that *anyone* could kill an unreg-

istered dog, and that this provision had now been amended so as to allow only certain officials to kill the same. Construing its own legislation, however, the court said that this amendment was for the preservation of peace and order, and "not for the purpose of giving to the keepers of unregistered dogs the right to recover their value if unintentionally killed by another person than a constable or a policeman." Under this construction of the amendment, it cannot be said that the force of the pre-existing law as regards the complete absence of a property right in an unregistered dog had been affected, and the Dickerman case cannot be said to be inconsistent with the other cases cited in this regard.

[25] Baer v. Tyler, 261 Mass. 138, 158 N.E. 536; Heisrodt v. Hackett, 34 Mich. 283, 22 Am.Rep. 529.

[26] Lacker v. Strauss, 226 Mass. 579, 116 N.E. 236, L.R.A.1917F, 434.

[27] Chapman v. Decrow, 93 Me. 378, 45 A. 295, 74 Am.Rep. 357.

[28] Miller, Justin, Pooch Poems 1.

[1] Act of June 19, 1878, 20 Stat. 174, ch. 323, § 4; Act of June 30, 1902, 32 Stat. 547, ch. 1332; D.C.Code (1940) § 47-2004.

be regarded as personal property in the courts of the District of Columbia for the purpose of a civil action for injury or destruction. I am of the view that this is what the statute does mean, and that accordingly the case should be reversed and the judgment for damages for Little Bits' death from the attack of Popo set aside. I am impelled to this conclusion for the following reasons.

1. Courts "are not at liberty to construe any statute so as to deny effect to any part of its language. It is a cardinal rule of statutory construction that significance and effect shall, if possible, be accorded to every word. . . ." Market Co. v. Hoffman, 1879, 101 U.S. 112, 115, 25 L. Ed. 782. All of the words of a statute must be taken as if Congress had intended them to have meaning, for Congress is not to be thought by the courts to have used language idly. That being so, if Congress in passing this statute had intended that both tagged and untagged dogs were to be regarded as personal property in the courts and the proper subject of a civil action for injury or destruction, why did it mention tags at all? Such mention is idle if both classes of dogs were to be regarded as property and made the subject of an action for injury or destruction. If it had been the intention of Congress that all dogs, whether tagged or not, were to be regarded as property in the courts, it could have said in terms that all dogs, tagged or not, should be so regarded; or it could have left the statute (and previous statutes—upon which I comment below) silent on the subject so that the common law rule, that although property in dogs is of an imperfect or qualified nature (so that they were not regarded as the subject of larceny) they are so far recognized as property that an action will lie for their conversion or injury, would prevail.[2] But Congress did neither of these things. True, it might have added to the statute the words "and no others" to make explicit that only tagged dogs were covered. But Congress is not required to express in the negative what an affirmative, in the normal use of words, clearly implies; and to say that "any dog wearing the tax tag . . . shall be regarded as personal property in all the courts of said District, and any person injuring or destroying the same shall be liable to a civil action for damages" does clearly imply that untagged dogs shall not be regarded as personal property in the courts and the proper subject of a civil action against any person injuring or destroying the same.

There is judicial confirmation of my view. In Connecticut a statute provided that "every person who shall steal or confine and secrete any registered dog or any

---

[2] The rule at the common law was thus expressed by Blackstone:

"In all these creatures, reclaimed from the wildness of their nature, the property is not absolute, but defeasible: a property that may be destroyed if they resume their ancient wildness, and are found at large. For if the pheasants escape from the mew, or the fishes from the trunk, and are seen wandering at large in their proper element, they become *ferae naturae* again, and are free and open to the first occupant that has ability to seize them. But while they thus continue my qualified or defeasible property, they are as much under the protection of the law as if they were absolutely and indefeasibly mine; and an action will lie against any man that detains them from me, or unlawfully destroys them. It is also as much felony by common law to steal such of them as are fit for food, as it is to steal tame animals: but not so, if they are only kept for pleasure, curiosity, or whim; *as dogs, bears, cats, apes, parrots, and singing birds; because their value is not intrinsic, but depending only on the caprice of the own-* er; *though it is such an invasion of property as may amount to a civil injury, and be redressed by a civil action.* Yet to steal a reclaimed hawk is felony both by common law and statute; which seems to be a relic of the tyranny of our ancient sportsmen. And, among our elder ancestors, the ancient Britons, another species of reclaimed animals, viz., cats, were looked upon as creatures of intrinsic value; and the killing or stealing one was a grevious crime, and subjected the offender to a fine; especially if it belonged to the king's household, and was the *custos horrei regii*, for which there was a very peculiar forfeiture. And thus much of qualified property in wild animals, reclaimed *per industriam.*" (II Bl. Comm. 470-1 (Wendell's ed. 1854)) (Italics supplied.)

The common law rule that dogs were not the subject of larceny was altered by statute beginning with the act of 10 George III, ch. 18, "an act for preventing the stealing of dogs." Commonwealth v. Flynn, 1934, 285 Mass. 161, 188 N.E. 627, 628, 92 A.L.R. 206.

dog under the age of six months, or who shall unlawfully kill or injure any such dog shall be liable to the owner in a civil action." § 4481 Gen.Stat.1902, as amended by c. 6, p. 6, Public Acts of 1903. In Dickerman v. Consolidated Ry. Co., 1907, 79 Conn. 427, 65 A. 289, the plaintiff's bulldog was killed by the defendant's street railway car. The dog, though over six months of age, was unregistered, and in that case, as in the instant case, the trial judge permitted a verdict for the plaintiff to be rendered nevertheless, instructing the jury that the dog, even though not registered, was entitled to be upon the public street, and was not a trespasser if upon the railroad tracks of the defendant, and that if the defendant was guilty of negligence it was liable for its death. But on appeal this ruling was reversed by the Connecticut Supreme Court of Errors, that court reasoning, in view of the statute, as follows:

". . . If one has such a property right in his unregistered dog, whether over or under six months of age, that he may recover its value by a civil action when it is either negligently or willfully killed by another person . . . he certainly would have no less a right after it was registered. Why, then, provide by statute a remedy by civil action for the unlawful killing of a registered dog or a dog under six months of age?" [65 A. at pages 289, 291.]

It is true that the Connecticut statute made it (as the District of Columbia statute does not) a misdemeanor to own or keep a dog without complying with the registration requirement, and this was commented upon in the course of the opinion of the Supreme Court of Errors. But the essence of the reasoning of the court was, so far as the question of the meaning of the words of the statute was concerned, that if the legislature had intended that the owner of an unregistered dog might recover its value by a civil action when negligently or wilfully killed by another, what purpose could the legislature have had in especially providing by statute a remedy by civil action for the unlawful killing of a registered dog. That is to say, the court there thought, as I think here, that the words of the statute providing for a civil action in respect of the killing of a registered dog were idle unless given not only their expressed positive meaning but also their necessary negative implication in respect of unregistered dogs.

In Chapman v. Decrow, 1899, 93 Me. 378, 45 A. 295, and Alabama Great Southern R. Co. v. Wedgworth, 1922, 208 Ala. 514, 94 So. 549, there were statutes which broadly parallel the District of Columbia act (except that the Alabama statute made it unlawful to keep an untagged dog) in that they recognized a civil liability for the destruction of a registered dog. In those cases it was held that such statutes do not necessarily imply a legislative intent that unregistered dogs shall not be the subject of a civil action for destruction. The Supreme Court of Alabama said that courts do not favor any construction of a statute that will destroy valuable rights pre-existing and that such an intendment will not be indulged unless it be a necessary implication from the language used, or essential to the effective operation of the law. But I cannot agree that the implication is not necessary if all the words of such statutes be given effect. Moreover, I think it would be faulty to reason in respect of the District of Columbia act, which, as stated above, does not make it a misdemeanor to keep an untagged dog, that the implication is not essential to the effective operation of the law—for if, despite the words of the statute, both tagged and untagged dogs are to be regarded as property in the courts and made the subject of a civil action for injury or destruction, the incentive for paying the required tax and securing a tag will be much diminished, if not destroyed, especially in this day when few dogs run at large whereby the pound master could seize them if not tagged. The District act is a revenue as well as a regulatory measure. What substantial incentive will there be to pay the tax if untagged dogs are to receive the same treatment as property in the courts as those whose owners have thought sufficiently of them to pay the tax.

The appellee relies upon Lacker v. Strauss, 1917, 226 Mass. 579, 116 N.E. 236, L.R.A.1917F, 434; Commonwealth v. Flynn, 1934, 285 Mass. 136, 188 N.E. 627, 92 A.L.R. 206; Jarvis v. Porter, 1893, 15 Ky.Law Rep. 447, and Pardee v. Royal Baking Co., 1923, 63 Utah 63, 221 P. 847. In Lacker v. Strauss it was held that liability for the killing of an unlicensed dog on a public highway is not limited to cases involving intentional, wanton or reckless acts, but includes cases of ordinary negligence. The court stated that the general rule supported by the weight of authority is that the

owner of a dog, licensed or unlicensed, may maintain an action for damages for the wilfull or negligent killing or injuring of such an animal. But neither Lacker v. Strauss nor the cases cited therein are based upon a statute like the one at bar, that is, one expressly providing that any dog wearing a tax tag shall be regarded as personal property in the courts and that any person injuring or destroying such a dog shall be liable in a civil action for damages.[3] Commonwealth v. Flynn holds merely that there can be larceny of an unlicensed dog, under a statute making it larceny to take feloniously "a domesticated animal," and has therefore no pertinence to the instant question. The citation to Jarvis v. Porter shows only an abstract of a decision of the Superior Court of Kentucky, reversing a case appealed from a circuit court, the abstract reading: *"For the killing of a dog the owner may maintain an action* without showing that he has complied with the terms of the Act of May 17, 1886, a dog being property in this State independent of that act." While the statute referred to recognizes dogs upon which a tax has been paid as "personal property for any and all purposes as fully as personal property of any other kind or description,"[4] in the absence of an opinion disclosing the reasoning of the court the case is not persuasive; and for

the reasons stated above I disagree with the position taken in the abstract. Pardee v. Royal Baking Co. holds that a licensed dog is the proper subject as property of an owner's action for damages for negligent destruction. The case has no pertinence.

Counsel for the appellee urge that there can be no change of the common law even by necessary implication. But here I think that their anguish over the passing of Little Bits, untimely snuffed out by the ruthless, pouncing Popo, has led them into error. It is true that where a statute is silent upon a subject, the common law principle relating thereto will not be held to have been changed. Murphy v. Preston, 1887, 5 Mackey 514, 16 D.C. 514, holding that § 5 of the local act,[5] which is silent as to *scienter,* does not repeal the common law requirement of *scienter* as a foundation for the liability of an owner for injury by a vicious animal, exemplifies that well settled rule, as does in another context Reeves & Company v. Russell, 1914, 28 N.D. 265, 148 N.W. 654, L.R.A. 1915D, 1149.[6] The appellee relies, however, with especial emphasis upon Hoage v. Murch Bros. Const. Co., 1931, 60 App. D.C. 218, 50 F.2d 983, wherein this court held that the local statutory provisions as to who may solemnize marriages do not nullify the right of common law marriage

---

[3] At the time Lacker v. Strauss was decided there was in existence in Massachusetts a statute broadly like the one at bar, in that it made liable to the owner in an action in tort whoever wrongfully killed a dog. Rev.Laws of Mass.1902, § 38, c. 208, as amended by the Act of April 26, 1913 (Acts 1913, c. 551). But Lacker v. Strauss did not mention the statute and was not decided in view of it.

[4] Acts of the General Assembly of the Commonwealth of Kentucky, 1885-6, vol. 1, c. 1228.

[5] Section 5 of the act provides: "Any person owning any dog so recorded [as a tax paid dog] in the collector's office shall be liable in a civil action for any damage done by said dog to the full amount of the injury inflicted. (June 19, 1878, 20 Stat. 174, ch. 323, § 5.)" D.C.Code (1940) § 47-2005. That section was held in Murphy v. Preston, 1887, 5 Mackey 514, 16 D. C. 514, not to repeal the common law requirement of *scienter.* In the case cited the Supreme Court of the District of Columbia, sitting in General Term, in commenting upon the proposition that the gist of the action against an owner for injury by an animal of tame nature, domestic in

its habits, and kept for use or convenience, or by an animal which although *ferae naturae,* has been so domesticated as to be classed with domestic or tame animals, is the knowledge by the owner of the animal's mischievous propensities, said: "It is true this principle has recently been sharply criticized (1 Taylor's Ev., 279), but it has the countenance of the earliest decisions; and these accord with the rule announced by the Hebrew lawgiver in Exodus, that if an ox gore a man or a woman the owner shall go free, unless 'the ox were wont to push with his horn in time past, and it hath been testified to his owner, and he hath not kept him in,' in which case only the owner should be held liable." (5 Mackey at page 515, 16 D.C. at page 515) In Bardwell v. Petty, 1923, 52 App.D.C. 310, 286 F. 772, the ruling in Murphy v. Preston was recognized as valid.

[6] That case holds that a statute recognizing the common law artisan's lien did not by its silence on the subject of priority abrogate the common law priority of that type of lien over those arising out of contract.

and wherein the court said that "the legislative intent to abrogate the common-law right may not be presumed, unless clearly expressed." But in that case the court merely followed the general rule that the provisions of statutes regulating marriage, providing who may solemnize, requiring a license, witnesses, etc., are to be construed as directory only and not to forbid common law marriage, unless express words of nullity are used. That rule rests obviously upon the strong and proper public policy not to question legitimacy and inheritance, and neither the ruling nor the language used in the Hoage case is properly to be taken to forbid the court, when inquiring as to legislative intent for the purpose of determining the effect of statutes generally upon the common law, to give consideration not only to the words themselves of the statutes but also to the normal implications of the words. It is true that "repeals by implication are not favored, and indeed that a statute will not be construed as taking away a common law right existing at the date of its enactment, unless that result is imperatively required; that is to say, unless it be found that the pre-existing right is so repugnant to the statute that the survival of such right would in effect deprive the subsequent statute of its efficacy; in other words, render its provisions nugatory." Texas & Pac. Ry. v. Abilene Cotton Oil Co., 1907, 204 U.S. 426, 437, 27 S.Ct. 350, 51 L.Ed. 553, 9 Ann.Cas. 1075. But in order to determine whether a pre-existing right is repugnant to a statute it must first be decided what the statute means, and in ascertaining legislative intent the necessary implication of the words used can no more be ignored than the words themselves. "The rule that statutes in derogation of the common law are to be strictly construed does not require such an adherence to the letter as would defeat an obvious legislative purpose or lessen the scope plainly intended to be given to the measure. . . ." Jamison v. Encarnacion, 1930, 281 U.S. 635, 640, 50 S.Ct. 440, 74 L.Ed. 1082. It is to be noted further, in respect of Hoage v. Murch Bros. Const. Co., that not only is it a far cry from statutes on marriage to those on dogs, but also that the marriage

statute in that case construed would parallel the dog statute involved in the instant case only if to the marriage statute were added a clause saying that "all unions solemnized as provided herein shall be recognized in the courts as marriages"— as the dog statute says "any dog wearing the tax tag hereinbefore provided for . . . shall be regarded as personal property in all the courts of the District," etc. It is to be noted also that that section (§ 4) of the dog statute particularly involved in the instant case cannot be compared with the section (§ 5) involved in Murphy v. Preston, supra, note 5, or with such a statute as was before the court in Reeves & Company v. Russell, supra, because § 4 is not silent in respect of property in dogs and right of action for their injury; it speaks on that subject and what it says must therefore be regarded.

2. But the question whether § 4 of the statute of 1878 repealed the common law or attached a new condition, that is, the obtaining of a tax tag, before property in, and right of action for injury to, a dog, can be recognized in the courts, cannot properly be determined by looking at § 4 out of the context of previous statutes concerning dogs; and there have been statutes, ordinances or regulations, in the District of Columbia on the subject of dogs since an early day. A by-law of the Corporation of Alexandria of September 24, 1804, required a dog to have a collar and permitted a constable to kill a dog without a collar. See Swann v. Bowie, Fed.Cas. No.13,672, 2 Cranch C.C. 221, 2 D.C. 221 (Circuit Court of the U. S. at Alexandria, 1820). An ordinance of the Corporation of Washington of January 14, 1858, made it unlawful to possess a dog without a license and required a collar with the name of the dog and the letters "C. W.," to which collar was to be attached the insignia or stamp furnished by the registrar; the act authorized police officers to kill dogs found going at large contrary to the provisions of law, but provided also that any police officer or other person who should kill a properly licensed and collared dog should forfeit not less than five nor more than twenty dollars.[7] In 1864, a

---

[7] For the full text of this ordinance see Webb's Digest of the Laws of the Corporation of the City of Washington, 1868, pp. 121-4 inclusive.

In Mayor, etc., of City of Washington v. Meigs, 1 MacArthur, 53, 58, 8 D.C. 53, 29 Am.Rep. 578 (Supreme Court D. C. 1873), which arose under this ordinance of January 14, 1858, it was held that "The law recognizes property in

statute applicable to that portion of the County of Washington outside Washington City and Georgetown provided that whenever the owner or keeper of a dog neglected or refused to pay the tax thereon it should be the duty of the proper officer for the collection of taxes in such part of the District to kill or cause to be killed every such dog.[8] In 1872 "An Act for the protection of owners of dogs" was passed. It provided that an owner who had complied with all the requirements of existing laws relating to dogs and those which might thereafter be passed should be entitled to recover upon proper proof of ownership any dog which may have been lost or stolen, and it also provided a fine to be imposed upon one convicted of stealing a dog; finally the act provided that "from and after the passage of this act dogs shall be deemed and held to be personal property."[9] Then came in 1878 the present statute, levying a tax, providing for a tag, authorizing seizure and destruction or sale of dogs without a tag, and providing that all dogs wearing the tag shall be regarded as personal property in the courts of the District of Columbia and for a civil action against any person killing or injuring the same.

The upshot of this statutory history is this: From an early day dogs have been required to be licensed and collared and have been recognized as property and as the subject of theft; but the intention of the legislative authorities has been to protect licensed dogs. It is especially evident that the present statute but strengthens and makes more explicit the 1872 act in respect of the right of legal protection for dogs and that, reading these two acts

---

and to dogs, and the owner thereof is entitled to his remedies for an invasion of his rights of property" and that "The right of property in animals cannot be declared unlawful unless a license is first obtained" and that "Congress did not confer upon the corporation the power to interfere with the rights of property as recognized at the time of the cession of the District." The theory of the case seems to have been not that the corporation did not have authority to legislate concerning dogs, but that Congress had not conferred upon the corporation power to interfere with the rights of property, as recognized at the time of the cession of the District, by conditioning the lawful possession of property upon the obtaining of a license. But this case was discredited in Sentell v. New Orleans, etc., Railroad Co., 1897, 166 U.S. 698, 17 S.Ct. 693, 41 L.Ed. 1169, wherein the Supreme Court held that a Louisiana statute which explicitly conditioned property in dogs upon their being placed upon the assessment rolls was valid, and that for injury to a dog not so enrolled there was no right of action. The Supreme Court said, after referring to Mayor, etc., of City of Washington v. Meigs:

"Even if it were assumed that dogs are property in the fullest sense of the word, they would still be subject to the police power of the State, and might be destroyed or otherwise dealt with, as in the judgment of the legislature is necessary for the protection of its citizens.
 . . .

 \* \* \*

"In Louisiana there is only a conditional property in dogs. If they are given in by the owner to the assessor, and placed upon the assessment rolls, they are entitled to the same legal guaranties as other personal property, though in actions for their death or injury the owner is limited in the amount of his recovery to the value fixed by himself in the last assessment. It is only under these restrictions that dogs are recognized as property. In addition to this, dogs are required by the municipal ordinance of New Orleans to be provided with a tag, obtained from the treasurer, for which the owner pays a license tax of two dollars. While these regulations are more than ordinarily stringent, and might be declared to be unconstitutional, if applied to domestic animals generally, there is nothing in them of which the owner of a dog has any legal right to complain. It is purely within the discretion of the legislature to say how far dogs shall be recognized as property, and under what restrictions they shall be permitted to roam the streets. The statute really puts a premium upon valuable dogs, by giving them a recognized position, and by permitting the owner to put his own estimate upon them.

"There is nothing in this law that is not within the police power. . . .." (166 U.S. at pages 704, 706, 17 S.Ct. at pages 695, 696, 41 L.Ed. 1169.)

[8] Act of July 25, 1864, c. 157, § 5, vol. 13, p. 193; see the Revised Statutes of the United States relating to the District of Columbia passed at the First Session of the 43rd Congress, 1874, § 189, p. 21.

[9] Act of January 19, 1872; see Laws of the District of Columbia, 1871-2-3, Pt. III, p. 68.

together in the context of the statutory history as a whole, it was not intended by Congress under the present act that untagged dogs should be regarded as personal property in the courts and the proper subject of an action for injury or destruction.[10] Therefore the judgment in favor of the appellee should, in my opinion, be reversed.

---

[10] The legislative history of the 1878 act shows that Congress was in no mood to give countenance as property in the courts to untagged dogs. When the bill (H. R. 4055) reached the Senate June 12, 1878 (7 Cong. Rec. 4472-3 (1878)), the following took place:

"The Secretary proceeded to read the bill, and was interrupted by

"Mr. Saulsbury. I think that bill had better go over. There is too much of a tale there about dogs.

"Mr. Morrill. I hope the Senator from Delaware will allow this bill to pass. This District seems to be the paradise of dogs, and all the dogs that are emancipated—

\* \* \*

"Mr. Morrill. They take possession of the city after ten o'clock at night and make night hideous. The Secretary has got about through reading the bill. I hope it will be allowed to pass."

Mr. Morrill might have embellished his remarks by quoting:

"And in that town a dog was found,
    As many dogs there be,
Both mongrel, puppy, whelp, and hound,
    And curs of low degree."

*The Vicar of Wakefield. Chap. 17, An Elegy on the Death of a Mad Dog, Stanza 4.*

These include:

"Mastiff, greyhound, mongrel grim,
    Hound or spaniel, brach or lym;
Or bobtail tike or trundle-tail."

*King Lear. Act III, Sc. 6, Line 71.*

The bill had originated in the House. During the proceedings there the Committee for the District of Columbia had instructed Mr. Williams of Michigan to report the bill back favorably and this he did on April 19, 1878 (7 Cong. Rec. 2666-7 (1878)). Mr. Townsend of New York sought and secured an amendment of § 3 which as originally written provided for but twenty-four hours' redemption period before sale or destruction of dogs seized by the pound master when found running at large without the tax tag, so that a forty-eight hour period was permitted. In so doing he said: "I confess I have a weakness and regard for some dogs, and I know some families who are as much attached to their dog as to a child. Now, if a dog, accidentally strays, it will not cost the public much to keep it for another twenty-four hours. I ask the gentlemen to amend that part of the bill by making it forty-eight hours." It was so amended. But this is the only kind word spoken for dogs, in either house.