Peter S. **KARLOW**, Appellant,

v.

William **FITZGERALD**, Appellee.

No. 15895.

United States Court of Appeals
District of Columbia Circuit.

Argued Nov. 14, 1960.

Decided Feb. 20, 1961.

Petition for Rehearing En Banc Denied
March 24, 1961.

Wilbur K. Miller, Chief Judge, dissented.

Mr. Frank F. Roberson, Washington, D. C., for appellant. Mr. James A. Belson, Washington, D. C., also entered an appearance for appellant.

Mr. Laidler B. Mackall, Washington, D. C., for appellee.

Before WILBUR K. MILLER, Chief Judge, and MAGRUDER, Senior United States Circuit Judge for the First Circuit,* and FAHY, Circuit Judge.

MAGRUDER, Circuit Judge.

Plaintiff and defendant were neighbors. Defendant's bulldog, named Bow-

* Sitting by designation pursuant to Section 294(d), Title 28 U.S. Code.

ser, went onto plaintiff's premises without the plaintiff's having shown any prior manifestation of consent to such entry. Plaintiff testified on his direct examination that when the defendant's dog came upon his premises it first attacked him by biting him on the arm, and then jumped on his dog. From other testimony it may perhaps be inferred that plaintiff suffered the injury complained of as a result of an attempt to separate the fighting dogs. It is difficult to say from the record that this bite was made by the defendant's dog rather than by the plaintiff's. As the complaint was amended in the course of the trial, it made no difference which. We do not find that the allowance of amendment to the complaint could be deemed an "abuse of discretion" by the trial judge.

The complaint, in a single count, was based upon alleged negligence of the defendant, and is in part as follows: "Defendant negligently kept said dog when he knew or should have known of its vicious and dangerous propensities and that it was accustomed to attack people. Defendant was likewise negligent in failing to keep the animal in a manner which would prevent its doing injury and allowing said dog to run at large and trespass on plaintiff's property without his consent in violation of the Police Regulations of the District of Columbia".

The common law was clear as to the liability of one who kept or "harbored" an animal which did some harm. If the animal was a non-indigenous wild animal, such as a tiger, the harborer's liability was a species of liability without fault. In the case of one who kept a domesticated animal, such as a dog, which in the generality of cases is deemed to be "harmless," the plaintiff had to show "*scienter*"—it was necessary to show that the defendant knew or should have known that his dog possessed some dangerous propensity. As the trial judge told the jury in this case: "So as a rule, the owner of a dog is not liable for its biting a person unless the owner has

reason to know that the dog is likely to do so."

It is worth while to point out that evidence of *scienter* did not have to be equivalent to evidence of negligence. As Kennedy, L. J., said in Baker v. Snell, [1908] 2 K.B. 825, 834, "the keeper of a ferocious dog, if he knows it to be ferocious, is in exactly the same category as the keeper of a naturally wild animal." That is to say, the keeper of a dog, *scienter* having been established, is liable for the foreseeable harm done by it, however much care he may have taken to keep the dog from doing harm. See Baker v. Snell, supra. The harboring of the dog is not a legal wrong to anybody, but it must be kept at the peril of the harborer; this is again a species of liability without fault. No doubt, there might be negligence in the manner in which the defendant kept or controlled his dog; in which case anyone suffering injury as a proximate result of this breach of duty would have a cause of action at common law. As was said in Prosser on Torts 325 (2d ed. 1955), "And scienter is of course not required where any negligence can be shown in the keeping or control of the animal." See Dickson v. McCoy, 1868, 39 N.Y. 400; Drew v. Gross, 1925, 112 Ohio St. 485, 147 N.E. 757; Weaver v. National Biscuit Co., 7 Cir., 1942, 125 F.2d 463.

The Congress of the United States long ago legislated for the District of Columbia on the subject of dogs. On June 19, 1878 (20 Stat. 173), it imposed an annual tax of two dollars per annum upon "all dogs owned or kept in the District of Columbia" and specified that the owner, upon paying the tax, should be furnished with a "tax-tag." Freedom to roam was given by § 4: "Any dog wearing the tax-tag hereinbefore provided for shall be permitted to run at large in the District of Columbia * *." Section 5 was in broad terms: "Any person owning any dog so recorded in the collector's office shall be liable in a civil action for any damage done by said dog to the full amount of the injury inflicted." It was shortly thereafter held, in

Murphy v. Preston, 1887, 5 Mackey 514, 16 D.C. 514, in view of the settled presumption that the legislature intended to make no innovation upon the common law further than its language expresses or plainly implies, that, despite the above words of § 5, the plaintiff still had the burden in the District of Columbia of alleging and proving that the keeper or harborer of the dog had *scienter* of the animal's vicious propensities. This interpretation of the act of Congress was subsequently adhered to in Bardwell v. Petty, 1923, 52 App.D.C. 310, 286 F. 772.

As late as 1942 the Court of Appeals for the District of Columbia recognized the continuing validity of Murphy v. Preston, supra, in an opinion by Vinson, Associate Justice, later Chief Justice of the United States, concurred in by Associate Justice Rutledge, who was later an Associate Justice of the Supreme Court of the United States. Scharfeld v. Richardson, 1942, 76 U.S.App.D.C. 378, 133 F.2d 340, 145 A.L.R. 980. It is perhaps noteworthy that, irrespective of this early interpretation of the 1878 Act in Murphy v. Preston, the Congress has tinkered with several sections of this statute but has made no change in § 5 so as to obviate the construction of that section by the courts. See 32 Stat. 547; 46 Stat. 522. It is now too late in the day for us to say that the Act of 1878 means anything different from what the court said it meant in Murphy v. Preston, and we do not understand that either the District Judge or appellee questions this.

The District of Columbia Police Regulations (as amended to August 25, 1955) enacted by the commissioners provide in Art. 18, § 2, that "No animal of the dog kind shall be allowed to go at large without a collar or tag, as now prescribed by law, and no person owning, keeping or having custody of a dog in the District shall permit such dog to be on any public space in the District, unless such dog is firmly secured by a substantial leash, * * * nor shall any dog be permitted to go on private property without the consent of the owner or occupant thereof."

We shall not consider the suggestion that this article of the police regulations, especially the requirement that a dog must be on a leash to be admitted to "any public space" in the District, is ultra vires and unconstitutional, in view of § 4 of the Act of Congress of 1878 providing that dogs wearing a tax-tag "shall be permitted to run at large in the District of Columbia". We say this because the question of the constitutionality of the police regulations was not made an issue in the district court and was not presented as one of the points on appeal to this court. Furthermore, there is no necessary inconsistency between § 4 of the Act of 1878 and that portion of the police regulations which prescribes that no dog shall be permitted "to go on private property without the consent of the owner or occupant thereof." A dog, though at large without a leash, might be subject to other means of control which would prevent it from trespassing on the neighbor's land without his consent.

As above stated, the complaint, perhaps inartistically, was founded solely upon the alleged negligence of the defendant. But if the evidence was sufficient to submit to the jury the issue of the defendant's *scienter*, the jury's verdict for the plaintiff must be sustained unless, indeed, there were some errors at the trial which called for a reversal. Defendant claims that there was an error of this kind in the instructions given to the jury, and the majority of this court agree. There was a general verdict for the plaintiff, in the sum of $3,000, and it is impossible to tell whether this verdict was based upon the claimed evidence of common law *scienter*, or upon the alternative ground which the trial judge permitted the jury to take, namely, that if they found that the defendant had violated the regulation forbidding a dog to trespass upon premises without the consent of the owner or occupier thereof, the defendant was guilty of negligence per se and was liable to plaintiff for all the proximate consequences of this negligence.

■ With respect to proximate cause, we think the trial judge was correct in telling the jury that they could find that proximate cause existed, since there is no question but the plaintiff was one of those for whose benefit the regulation was issued, and that the risk of injury to human beings arising from the invasion of premises by unwanted dogs was one of the risks sought to be eliminated by the police regulation. The trial judge told the jury: "The regulation to which I have referred has for one of its purposes the promotion of the safety of children, old people, families and individuals in their home premises and to guard them against the hazard or danger of being bitten or harmed by dogs. The regulation applies to all dogs, whether vicious or not vicious, whether with or without dangerous tendencies."

It was clearly in evidence that the plaintiff's mother, who had rented the premises next door to the defendant and had just moved into the neighborhood, had never manifested to the defendant any consent that his dog should come on her premises; and evidence which the defendant sought to introduce of consent by the prior owner was properly excluded by the trial judge, on the issue of compliance with the police regulation.

■ With regard to the evidence offered by the plaintiff to satisfy the requirement of *scienter*, there was absolutely none that defendant's dog "was accustomed to attack people," as was alleged in the complaint. We concede that evidence of the possession of other types of dangerous propensities might suffice; but at least the harm of which the plaintiff is complaining must have been caused by the operation of the particular risk which such dangerous propensity brought into play. Thus, it was in evidence that the defendant's dog had a "fascination" for turning wheels; it chased automobiles and would attempt to attack a moving wheel or to bite the moving wheels of a lawn mower or of a baby carriage. But evidence of this sort can have no relevance on the subject of *scienter*, since plaintiff does not claim that his injuries were a consequence of this special habit. See Keightlinger v. Egan, 1872, 65 Ill. 235; Warrick v. Farley, 1914, 95 Neb. 565, 145 N.W. 1020, 51 L.R.A.,N.S., 45; Fowler v. Helck, 1939, 278 Ky. 361, 128 S.W.2d 564; Glanville v. Sutton, [1928] 1 K.B. 571.

The other instances in the record which appellee claims make out a case of *scienter* are as follows: (1) Defendant's wife testified that Bowser would frequently bump into people. She said that when the dog was chasing a stick or a ball, it would concentrate on that object and go right after it; that it would "run right into a tree if it was in his way". We shall not dwell upon the difficulty that defendant was not shown to have been aware of this so-called "dangerous propensity" of his dog. But anyway, it is not claimed by appellee that the injuries which he suffered resulted from the operation of this particular propensity. (2) Defendant testified to an occasion in which "the father of a newsboy" was present when Bowser started a dog fight, during which the father suffered a dog bite, possibly from defendant's dog. We wonder whether getting into a dog fight is an "abnormal propensity" for a dog, because almost any dog will get into a dog fight once in a while; and if a human being undertakes to separate two fighting dogs, it is foreseeable that he may suffer an accidental bite. With further reference to these dog fights, defendant's wife testified that her husband knew that his dog "occasionally had a dog fight," as the defendant himself admitted. (3) There was another incident involving defendant's postman which the defendant frankly acknowledged. It seems that Bowser was used to grabbing the mail out of the postman's hand, and the postman testified that he once received "a slight nip on the thumb. * * * Didn't amount to anything"; that it appeared to him to have been a pure accident, without any intention on the dog's part to bite him. This slight wound was treated by the defendant, who put a bandaid on it.

■ Concerning defendant's alleged "negligence per se" in permitting his dog to go onto plaintiff's premises without the latter's prior consent, it was in error for the trial judge to permit a finding of negligence based solely upon a finding that the defendant might have incurred a criminal penalty for violation of the aforesaid police regulation. We do not have a case here where the defendant deliberately flouted as unnecessary a safeguard which the police regulation sought to impose. Assuming, as perhaps we must, that the defendant was acquainted with the terms of the police regulation, it clearly appeared in evidence that the plaintiff had just moved into the neighboring premises and that the defendant was not aware of the changed tenancy. He supposed the next door neighbor had given consent to the entry of his dog, which may explain why he took no steps to confine the dog to his own place.

Dean Thayer in his celebrated article on "Public Wrong and Private Action" in 27 Harvard Law Review 317 (1914), discusses the effect of the breach of a statute or ordinance which made it a misdemeanor punishable by fine to leave a horse unhitched on the highway. We would agree with Dean Thayer that it should be deemed negligence per se for the defendant to leave his horse unhitched upon the highway in violation of the regulation where he took this action merely because he was of opinion that this particular horse was so sleepy and safe as to render the ordinance superfluous and unnecessary as to it. It would be inconsistent "with ordinary prudence for an individual to set his own opinion against the judgment authoritatively pronounced by constituted public authority, for the ordinance has prohibited leaving *all* horses unhitched, without exception, and has done this in order to prevent just such consequences as have occurred." 27 Harv.L.Rev. at 322.

This must be what Judge Cardozo had in mind in Martin v. Herzog, 1920, 228 N.Y. 164, 126 N.E. 814, 815, when at page 168 he said: "We think the unex-

cused omission of the statutory signals is more than some evidence of negligence. It *is* negligence in itself." He was dealing with a case where the plaintiff was charged with contributory negligence per se for the violation of a statute requiring all buggies to display lights. Plaintiff had offered no evidence tending to show why he had omitted this statutory safeguard. Since a valid police regulation, like a statute, is law within its sphere of operation, Cardozo, J., was right in his criticism of the distinction which some courts have made between violation of statutes enacted by the state legislature and violation of police regulations or ordinances enacted by "subordinate officials". 228 N.Y. at page 169, 126 N.E. at page 815.

It is clear enough that adoption of the rule of "negligence per se" does not rigidly require that the plaintiff must win the case if the defendant is guilty of a criminal violation. It is only the "unexcused omission" of a regulatory safeguard which can be negligence per se. This only means that if the defendant introduces no evidence tending to show that his omission of the statutory safeguard was consistent with due care in the circumstances, there must be a "presumption" that such omission was willful or heedless. Thus, in Hecht Co. v. McLaughlin, 1954, 93 U.S.App.D.C. 382, 214 F.2d 212, though the defendant might have violated the building code of the District, we held that defendant was entitled to prove that the violation was made under circumstances consistent with due care on his part. In other words, it was not a case of a willful or heedless flouting of a legislative safeguard; and in effect this court held that a jury might well have found that the defendant's violation was "excused" in the situation shown.

It may be granted that there are cases relating to injuries caused by eating deleterious foodstuff in which it has been held that, if the plaintiff establishes that he was one of the class intended to be protected by the statute, he is entitled to invoke a common law doctrine that the

plaintiff may recover civilly for his bodily injuries and that such "liability exists independently of any showing of culpability other than a showing of a violation" by the defendant of the criminal statute. Doherty v. S. S. Kresge Co., 1938, 227 Wis. 661, 278 N.W. 437, 441. We believe it is unsafe to generalize from these foodstuff cases. In our opinion, the better view is represented by Phillips v. Britannia Hygienic Laundry Co., Ltd., [1923] 2 K.B. 832, in which the defendant, having without his fault incurred a criminal penalty for violation of a regulation requiring a motor car on the highway to be in safe operating condition, was held not liable civilly to a plaintiff whose vehicle was damaged by a wheel of the defendant's vehicle which came off with the breaking of an axle.

 We have just said that the common law of torts has inflicted a civil liability in the foodstuff cases on the principle that a person who suffers damages through violation of a criminal statute passed for his protection may recover civilly. It would be wrong to attribute the resulting imposition of a liability without fault to any supposed "intention of the legislature" in enacting the criminal statute or police regulation. Certainly that is true in the present case, for we cannot accept that the commissioners, who are authorized to issue police regulations carrying a criminal penalty for violation thereof, are also authorized to legislate with respect to changing a fundamental concept of the law of torts. The congressional law of 1878, expressly dealing with civil liability, was held in Murphy v. Preston, supra, 5 Mackey 514, 16 D.C. 514, not intended to dispose of an essential common law requirement of *scienter* in dog cases. It would be odd if we had to hold that a police regulation which did not even mention civil liability should have the effect of imposing a civil liability without any proof of fault, in violation of another basic common law concept. As this court pointed out in Peigh v. Baltimore & Ohio R. R. Co., 1953, 92 U.S.App.D.C. 198, 204 F.2d 391, 393, 44 A.L.R.2d 671,

the doctrine of negligence per se in the violation of a criminal requirement is not to be used "to produce liability based not on real fault, or any real departure from standards of prudent conduct, but only on a technicality".

The judgment of the District Court in favor of the plaintiff is vacated and the case is remanded to that Court for further proceedings not inconsistent with this opinion.

WILBUR K. MILLER, Chief Judge (dissenting).

The majority opinion does not convince me that the District Court's judgment should be vacated. Ross v. Hartman, 1943, 78 U.S.App.D.C. 217, 139 F.2d 14, 158 A.L.R. 1370. Cf. Boland v. Love, 1955, 95 U.S.App.D.C. 337, 342, 222 F.2d 27, 33. I would affirm.