## GOODMAN v. DISTRICT OF COLUMBIA.
### No. 434.

Municipal Court of Appeals for the
District of Columbia.

Jan. 23, 1947.

Joseph A. Kaufmann, of Washington, D. C. (F. Joseph Donohue and Milton S. Kronheim, Jr., both of Washington, D. C., on the brief), for appellant.

Edward A. Beard, Asst. Corp. Counsel, of Washington, D. C. (Vernon E. West, Corp. Counsel, and Chester H. Gray, Principal Asst. Corp. Counsel, both of Washington, D. C., on the brief), for appellee.

Before CAYTON, Chief Judge, and HOOD and CLAGETT, Associate Judges.

CAYTON, Chief Judge.

Appellant, who is a practicing lawyer, was found guilty of violating the so-called Baby Broker's Law. Code 1940, §§ 32—781 to 32—789. He appeals.

Appellant was associated as counsel for a woman who was separated from her husband and who was being sued for divorce in Rhode Island on the ground of adultery. She was eager that the divorce be granted and so she was advised to let the case go by default. At their first conference she revealed that she was pregnant by a man other than her husband, and asked appellant to find someone who would provide a good home for her child when born, and adopt it. He advised her to go to a welfare agency or to a certain infants' home of her religious denomination. She rejected this advice because she had herself been in an orphanage and did not wish her child brought up in such an institution; she insisted on having it placed in a private home.

Appellant told her that if he heard of any suitable potential foster parents he would let her know. She phoned him persistently at his home and office several times a week to inquire if he knew of anyone who would take her child. Finally when she called him about two months before the child was born he told her that he had learned of a couple interested in adopting the child, and he would have them contact her; she told him she preferred to remain anonymous and did not want to know the names of the prospective parents. Thereupon, as the transcript recites, appellant "offered to talk to the prospective adopters, report to her, and to otherwise conclude the matter for her so that the parties would not have to meet face to face." And so it was agreed that appellant should come to the hospital after the confinement and arrange for the transfer

of the child. The mother had in the meantime instructed the hospital to permit the couple to see the child. The couple had through their own physician obtained from the mother's physician a satisfactory report as to her physical condition. After the child was born appellant took a release agreement to the hospital which he read to the mother in the presence of two of her friends and which she willingly signed. When she was ready to leave the hospital, appellant went there, took the child from her, and physically delivered it to the adopting father who was waiting at the front door of the hospital, while the mother left by a side door. The couple later adopted the child through court proceedings in Maryland.

Appellant charged the mother nothing in the divorce case and refused to accept any fee for his services in connection with placing the child for adoption. He did, however, accept about one-third of $294.-90, which he had collected from the adopting couple to cover the mother's medical expenses.

The mother later changed her mind and sought appellant's services in regaining custody of the child. He refused, saying that he "could not accept such an assignment in good conscience and that the child had probably been adopted." Not long afterwards a complaint was filed against appellant with the Board of Public Welfare on the ground that he had no license to place children for adoption. Such complaint resulted in the prosecution and conviction which are here under review.

The Act under which appellant was prosecuted was passed early in 1944 and was the culmination of many years of struggle on the part of social agencies and others to put an end to the unregulated transfer, placing and brokerage of babies and the social evils which resulted therefrom. Until that time this was one of the very few jurisdictions in which there was no control over such activities.

The Act is comprehensive in nature and expresses the purpose of Congress to secure for children under sixteen who are placed in family homes other than their own or those of relatives, the best care and guidance, so as to serve the welfare of such children and the best interests of the community. To accomplish that purpose Congress prohibited the operation of any child-placing agency by anyone not specifically licensed for that purpose by the Commissioners. It authorized the Board of Public Welfare to investigate applicants for licenses and if found to meet certain requirements set out in the statute, to recommend them to the Commissioners. To prevent "careless placement of babies for adoption, without adequate consideration of the interests of the parents, the children, and the adopting parents,"[1] Congress wrote into the Act this provision:

"Any person, firm, corporation, association, or public agency that receives or accepts a child under sixteen years of age and places or offers to place such child for temporary or permanent care in a family home other than that of a relative within the third degree shall be deemed to be maintaining a child-placing agency." Code 1940, § 32—782.

and followed it with this later provision:

"No person other than the parent, guardian, or relative within the third degree, and no firm, corporation, association, or agency, other than a licensed child-placing agency, may place or arrange or assist in placing or arranging for the placement of a child under sixteen years of age in a family home or for adoption." Code 1940, § 32—785.

■ The purpose of Congress in enacting this legislation is of course our first point of inquiry,[2] for that purpose is traceable to the evils it sought to correct.[3] It

[1] Report of Committee on the District of Columbia (Report No. 580) to the House of Representatives, June 23, 1943.

[2] United States v. American Trucking Ass'ns, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345; Small v. United States, 71 App.D.C. 332, 110 F.2d 122, 127 A.L. R. 814; Janof v. Newsom, 60 App.D.C.

291, 53 F.2d 149; Price v. Quill, D.C. Mun.App., 46 A.2d 311.

[3] Scharfield v. Richardson, 76 U.S.App. D.C. 378, 133 F.2d 340, 145 A.L.R. 980; Railroad Retirement Board v. Bates, 75 U.S.App.D.C. 251, 126 F.2d 642; Herder v. Helvering, 70 App.D.C. 287, 106 F.2d 153, certiorari denied 308 U.S. 617,

was brought to the attention of Congress in hearings before committees of both the House and Senate,[4] that a flourishing business was operating in the District, supplying the demand for children wanted for adoption. At the hearings it was emphasized that the placement of children for adoption could not be expected to succeed without a careful investigation by established social agencies with trained personnel, of the physical and social background of all the parties before the child was placed, followed by continuing investigation and supervision until the formal adoption was consummated.[5]

Congress therefore decreed that commercial agents, baby brokers, and even the best-intentioned citizens serving upon a non-commercial basis and from the most humane motives, must none of them be permitted to place children for adoption unless previously investigated, found qualified, and licensed. This was to protect children and parents not only from corrupt or irresponsible intermediaries but also from the careless and untrained.

To emphasize that purpose Congress in the plainest language made it unlawful for anyone not licensed to "place or arrange or assist in placing or arranging for the placement" of a child.

■ What the appellant did is very clear. He "arranged" and "assisted" in placing and personally consummated the placement of the child. He was the intermediary who produced the prospective adopters and arranged contact (indirect though it was) with the mother. He it was who presented to the mother the document for release of her child and obtained her signature. He it was who arranged for the presence of the adopting parents at the hospital. And he it was who performed the final act of placement by accepting the child from the arms of its mother and physically handing it over to the adopting father. It would be difficult to imagine a more clear-cut infraction of the letter as well as the spirit of the law.

That appellant did these things without compensation, that he was animated by the most humane motives, that he was perhaps imposed upon by the mother or yielded in sheer pity to her cries of distress—all this we may concede. And all this appeals to our sympathy for him; but it cannot justify us in holding that his acts were within the law.

■ If appellant were proceeding on the assumption that he, as a lawyer, had a right to place the child for adoption, though he was unlicensed for that purpose, he was mistaken. We look in vain for any token of intention within the statute that the placing of babies by lawyers should be in any different or forgiven status than such placing by citizens in any other class. No court has said that such statutes do not apply to lawyers. No scrutiny of the sections involved can yield up such an exemption by mere process of judicial construction. If it could, the courts might just as properly create a whole series of exemptions; and before long the process of erosion by judicial construction would be complete and the Act ineffective.

We are told that if defendant is not absolved, no lawyer can feel safe when he is called on to advise or act in an adoption case. Even if that were so we could not help it; we would have to apply the statute as it is written. But we think the careful lawyer will have little trouble in determining what he may lawfully do in

60 S.Ct. 262, 84 L.Ed. 530, rehearing denied 308 U.S. 639, 60 S.Ct. 377, 84 L. Ed. 530.

4 Hearings before the House District Committee on H.R. 2618, 78th Congress, June 21, 1943; hearings before the Senate District Committee on H.R. 2618, 78th Congress, March 7, 1944.

5 One of the regulations approved by the Commissioners pursuant to the statute provides that "a supervisory period of at least six months during which the child resides with the prospective adoptive parents shall be required before legal adoption is consummated." (Regulation VII, 2). This regulation was obviously designed to prevent hasty action or later change of mind on the part of either the natural or adoptive parents. And it is plain that the prescribed supervision cannot be expected when the adoption is arranged by other than a licensed placement agency.

such situations. We think even a cursory reading of the statute will tell him how far he may go and where he must stop.

We think it plain that so long as the lawyer gives only legal advice; so long as he appears in court in adoption proceedings, representing either relinquishing or adopting parents; so long as he refrains from serving as intermediary, go-between, or placing agent; so long as he leaves or refers the placement of children and the arrangements for their placement to agencies duly licensed, he is within his rights under the statute. If that were all this appellant had done his conviction could not stand. It is plain he has done much more. Blameless though he is by ordinary standards of professional ethics, he has run afoul a statute which declares his actions malum prohibitum.

Affirmed.