Edward GALISON, Appellant,

v.

DISTRICT OF COLUMBIA, Appellee.

Leonard R. GOLDSTEIN, Appellant,

v.

DISTRICT OF COLUMBIA, Appellee.

Nos. 12196, 12439.

District of Columbia Court of Appeals.

Argued March 14, 1978.

Decided June 12, 1979.

Leslie Scherr, Washington, D.C., for appellant Galison.

Joel M. Finkelstein, Washington, D.C., for appellant Goldstein.

Dennis McDaniel, Asst. Corp. Counsel, Washington, D.C., with whom John R. Risher, Jr., Corp. Counsel, Washington, D.C., at the time the case was argued, and Richard W. Barton, Deputy Corporation Counsel, Washington, D.C., were on the brief, for appellee.

Before KERN, NEBEKER and HARRIS, Associate Judges.

NEBEKER, Associate Judge:

Appellant Galison was convicted, after trial to the court, of one count of arranging for the placement of a child under sixteen years of age without having been licensed as a "child-placing agency."[1] D.C.Code 1973, §§ 32–785, –788. Appellant Goldstein was convicted of three counts under the same code provisions. Each argued that Congress, in enacting the provisions of title 32, chapter 7B (hereinafter the Baby Broker Act, or Act), did not intend to reach the conduct proved in these cases. Galison also contended that the government failed to prove that he was not licensed at the time of the alleged activities. We are of the opinion that the activities performed by Galison are within the reach of the Act and that his claim of insufficient evidence (proof of no license) is unpersuasive. On the other hand, we agree with appellant Goldstein that his conduct was not of the type intended to be prohibited by the Act, and therefore reverse his conviction. Although consolidated on appeal, the two cases are sufficiently distinct to warrant separate discussion.

## I. Edward Galison

Appellant Galison is an attorney licensed to practice law in the State of New York. Prior to August 31, 1976, his associate, Spiegelman, was contacted in New York by a Florida attorney. The Florida attorney explained that he had been unable to arrange for an adoption in Florida of the expected child of a Florida resident. Upon locating a New York family that would agree to adopt the child, Spiegelman suggested to his Florida contact that the mother come to New York for the child's delivery. The expectant mother, however, indicated that she would be willing to travel only as far as the District of Columbia. The Florida attorney and Spiegelman arranged for the woman and her mother (the grandmother), to stay in the District of Columbia beginning on August 31, 1976.

Upon arrival in the District, the woman had a change of heart and decided that she would keep the child. She so advised Galison, who thereupon came to the District of Columbia and persuaded her that adoption was "the right thing to do." After he informed her that her medical and living expenses in the District would be paid for and that she would receive $2,000 in addition to her medical and living expenses, she executed documents by which she consented to the proposed adoption and authorized the hospital to release her yet-unborn child to appellant.

Later, in September, the expectant mother again desired to abandon the adoption plans and contacted Galison to inform him that she wanted to return to Florida. Galison explained that the prospective parents were waiting for the baby to be delivered and reminded her of the money that they had provided for her. Because of the money involved, the woman decided to remain in the District.

In October, one week before the baby was born, the grandmother telephoned Galison regarding a Washington newspaper article which stated that it was illegal to arrange an adoption without going through an agency. Galison assured the grandmother that his actions were legitimate. Galison then spoke with the woman and played on her sensitivities by telling her that the prospective parents had not contributed any of the money for her expenses, that he had taken the money from his own pocket and that she should consider all the money invested in her thus far. The woman relented.

1. There is no entitlement to trial by jury under the Placement of Children in Family Homes statutes (D.C.Code 1973, §§ 32–781 through 791) involved in these cases, as the maximum penalty prescribed is a fine of not more than $300 or imprisonment for not more than 90 days, or both. See D.C.Code 1973, § 16–705(b)(2); Dobkin v. District of Columbia, D.C. App., 194 A.2d 657 (1963). Goldstein and two physicians were also charged with the crime of conspiracy, D.C.Code 1973, § 22–105a, but were acquitted. The maximum penalty for the conspiracy charge in this case could not exceed the maximum penalty provided for the object offense, which in this case was "child-placing without a license." Id. at § 22–105a(a). Therefore, since the maximum penalty was a fine and/or imprisonment for not more than 90 days, appellants were not entitled to a trial by jury on this count either.

Subsequent to the October 19th birth of the baby, the mother once again decided that she wanted to keep the baby, but she was "afraid of the money I owed and the money that he had invested in me. I was afraid to back out. I didn't know what to do." The grandmother contacted a social worker, and, as a result, the police were advised of the circumstances of the proposed child placement. Galison, meanwhile, once again attempted to persuade the mother to continue with the planned placement by arguing that it was in everyone's best interest and by reminding her that there was already $6,000 "invested" in her. The grandmother then obtained the release of the baby from the hospital, received approximately $2,200 from Galison, and gave the baby to Galison. Upon leaving the hospital with the baby, Galison was arrested.

We are asked to decide whether Congress intended the Baby Broker Act to prohibit Galison's activities. We resolve the issue in the affirmative. The purpose of the District's Baby Broker Act is expressed in D.C. Code 1973, § 32–781:

> The purpose of this chapter is to secure for each child under sixteen years of age who is placed in a family home, other than his own or that of a relative within the third degree, such care and guidance as will serve the child's welfare and the best interests of the District of Columbia; and to secure for him custody and care as near as possible to that which should have been given him by his parents.

To fulfill the purposes of the Act, i. e., to assure the care and guidance necessary for the welfare of the child and to protect the interests of the District, Congress required registration and licensing of individuals

placing children. This requirement is evident in the specific provision of the Act with which appellant Galison is charged as having violated:

> No person other than the parent, guardian, or relative within the third degree, and no firm, corporation, association, or agency, other than a licensed child-placing agency, may place or arrange or assist in placing or arranging for the placement of a child under sixteen years of age in a family home or for adoption. . . . [D.C.Code 1973, § 32–785.]

The penalty for violation of § 32–785 is set forth in § 32–788.[2]

 On its face, § 32–785 proscribes all placement activities regardless of where they occur and regardless of the relationship of the individuals involved to the District. As § 32–781 states, however, the act was intended to apply only to situations in which the District has an interest (including the interest in serving the child's welfare). Therefore, some contact affecting a District of Columbia governmental interest, which is protected by the Act, must be shown before § 32–785 becomes applicable.

Indeed, all parties in this case agreed that a placement must bear some relationship to the District to be proscribed by the Baby Broker Act. The government's position is that § 32–785 applies in all cases involving geographical contact with the District. Under this interpretation, this section would require the registration of any person, who is not specifically excluded by the Act's other sections,[3] who carries on any child-placing activity within the geographical boundaries of the District.[4] Viewing § 32–

2. Section 32–788 reads:

> Any person, firm, corporation, association, or public agency who conducts a child-placing agency without a license as provided for in this chapter or who violates any of the provisions of this chapter shall, upon conviction, be fined not more than $300 or imprisoned for not more than ninety days, or both. Prosecution for violations of such sections shall be upon information in the criminal division of the Superior Court of the District

of Columbia by the corporation counsel of the District of Columbia.

3. Persons excluded from the Act are relatives within the third degree of the child who place the child with a relative who is also within the third degree of the child. D.C.Code 1973, §§ 32–782, –785.

4. Also, under the government's assertion that geographical presence alone is sufficient to invoke the statute's proscriptions, the grandmother would also be subject to prosecution under

785 with regard to the framework of the chapter as a whole, however, we hold that a minimal or coincidental geographical contact alone is insufficient and that a substantial additional nexus is required.

Three sections of the Baby Broker Act indicate that § 32–785 applies only to placements which have a substantial nexus with the District. Section 32–786(a) requires that every "relinquishment of parental rights shall be recorded and filed in a properly sealed file in the Family Division of the Superior Court for the District of Columbia . . . ." This legislation connotes the District's interest in the stability of District families and the welfare of District children by requiring that an official, albeit sealed, record be kept of the placement of the District's children. Another provision, § 32–782, provides that "[n]o [unlicensed] child-placing agency shall be maintained in the District of Columbia[.]"[5] This provision of the Act is intended to prevent "fly-by-night groups [which] might spring up . . . [,] engage in occasional [unregulated] placements" and utilize the District as a base for their operation. (*Hearings on H.R. 2618 Before a Subcomm. of the Senate Comm. on the District of Columbia*, 78th Cong., 2d Sess. 10 (1944) (statement of Miss A. Patricia Morss). A third section evidencing Congress' concern for placement activities which bear a substantial nexus to the District, § 32–785a, reads as follows:

> Notwithstanding the provisions of this chapter, the [Mayor] [is] authorized to enter into agreements with any person . . . licensed or authorized by a State or country for the care and placement of minors, permitting such person . . . to place nonresident children in foster or adopting homes *in the District of Columbia.* . . . [Emphasis added.]

The District's interest manifest in this section of the Act is the regulation of the placement of children in the homes of District families. These provisions indicate some of the substantial District interests intended to be protected by the Act. These provisions also suggest that Congress intended these sections, at least, to be applied only when the District has a significant interest in the placement activity.[6]

On the basis of this discussion and after analysis of the statute, we find that § 32–785 requires a substantial nexus similar to those required by the other sections of the statute mentioned above. The test to be used in determining the applicability of § 32–785 in this case, then, is whether the District has a significant interest in Galison's attempted placement.

▇ We are of the opinion that the attempted placement by Galison offended two substantial interests of the District. The first interest is to protect the parental rights of natural mothers residing in the District. This is accomplished by regulating placement activity carried on within the District. Here, the natural mother resided in the District for a period of approximately two months. The woman's stay was not due to medical reasons alone, but was attributable primarily to an adoption plan developed by Galison. The plan provided that the woman remain in the District until the birth of the baby, at which time she would be required to surrender her child to

---

D.C.Code 1973, § 32–782, since she "assisted in placing . . . the child" by obtaining its release and giving it to Galison who was not a relative within the third degree. *See infra* at 1269.

5. A "child-placing agency" is defined by § 32–782 as: "Any person, firm, corporation, association, or public agency that receives or accepts a child under [16] years of age and places or offers to place such child for temporary or permanent care in a family home other than that of a relative within the third degree . . . ."

6. This reasoning is consistent with previous decisions by this court on the applicability of the Baby Broker Act. In both *Dobkin v. District of Columbia, supra,* and *Goodman v. District of Columbia,* D.C.Mun.App. 50 A.2d 812 (1947), it appears that the infants being placed for adoption were born to mothers residing in the District. In *Anderson v. District of Columbia,* D.C.Mun.App., 154 A.2d 717 (1959), all parties, apparently, were residents of the District. We are unpersuaded by the government's nonanalytical reliance on these cases.

Galison. After arriving in the District, she became an uncooperative if not an unwilling partner in the plan. Her discontent prompted Galison to undertake activities which were designed to persuade her to change her mind. Since the woman was residing in the District, the District had an interest in protecting her parental rights over her child, which were threatened by Galison's conduct. Inasmuch as Galison was not licensed to engage in such activity, he became subject to the sanctions of the Baby Broker Act.

A closely-related District interest is to protect mothers within the District from being coerced, compelled, forced or pressured to feel constrained or obliged to yield up their infants whether by threats of violence, financial withdrawal, or derision, regardless of how oblique or veiled the pressure may be. There is no requirement that the mother reside in the District to receive this protection. If pressure is exerted upon a mother while in the District to make a decision to surrender her child, the guardianship of the District is invoked. Here, on four separate occasions following her arrival in the District, the natural mother indicated to Galison that she had changed her mind and did not want to give up her child.[7] In each instance, discussions or negotiations ensued in which Galison attempted to persuade the woman to place the child. He reminded her of the expenses which he had incurred in anticipation of the child's adoption, of her personal gain of $2,000 for surrendering the child, and of the expectation of the family waiting to adopt the newborn child. On two of these occasions, Galison visited the District. The first time was for the purpose of pressuring the mother into going through with the placement. The second visit was with the intent of taking the child to New York, which Galison would have done, after overcoming the mother's express desire to keep the child, had he not been arrested. The mother's conduct after arrival in the District and her

testimony at trial leaves no doubt that her compliance with Galison's plan was simply submission resulting from her fear of being unable to repay the "investment" which Galison claimed to have made in her. We, therefore, conclude that the District's interest in protecting the mother from any pressure to relinquish her child was offended by Galison's activities, and the provisions of the Act, as a consequence, became applicable.

■ Galison argues that the government failed to prove that he was not licensed at the time of the alleged offense. We disagree. The record shows that during the months of September and October of 1976, when appellant engaged in action that violated the Act, he was a New York State practicing attorney, but not a licensed child-placing agency in the District of Columbia. At trial, the government called the acting chief of Licensing and Certification as a witness. While his testimony was not a model of conciseness, it was sufficient to permit the court to find that Galison was unlicensed. Specifically, the witness testified on direct examination that his "responsibility is to license all the child-placing agencies in the District", that he had searched "the records" and found no Edward Galison licensed to place children for adoption, and that there "are six child-placing agencies in the District that are licensed." On cross-examination, the witness, under questioning by the defense, identified each of the six licensed child-placing agencies in the District. During re-cross-examination, the court engaged in the following colloquy with the witness:

> THE COURT: . . . Mr. Sauls [the witness], you've indicated that you searched the records and you found no license for Mr. Galison. Was that as of October 1976? Was there a license existent at that time?
> THE WITNESS: Yes.
> THE COURT: He did have a license at that time?

7. The fact that the mother had entered into a formal agreement to give up her child is not relevant to a decision on Galison's innocence or guilt under the Act. Since it is not central to

the question before us, we defer to another time consideration of the validity of such an agreement and the consequences of a mother's revocation.

THE WITNESS: Oh, no; no.

\* \* \* \* \* \*

THE COURT: Are you unable to say whether he had a license in October 1976?
THE WITNESS: . . . I know that I have not found licensed Mr. Galison. . .

\* \* \* \* \* \*

I have not licensed Mr. Galison as an individual. We cannot do that according to the D.C.Code. It has to be a licensed placement agency, and not an individual. While the witness may have been incorrect as a matter of law about the code's mandate,[8] his unimpeached assertion, as chief of licensing, was that (1) he had not licensed appellant as a child-placing agency, and (2) there were only certain child-placing agencies in the District, of which appellant Galison was not one.

■ Galison also claims that the government failed to prove beyond a reasonable doubt that he was not a relative within the third degree of the child. (*See supra* note 3.) We endorse the trial court's determination that Galison had the burden of proving, as an affirmative defense, his relationship to the child. Absent that proof, this claim is dismissed as lacking merit. *See James v. United States*, D.C.App., 350 A.2d 748, 749 (1976).

Accordingly, there is in fact evidence sufficient to support the court's judgment of conviction.

## II. Leonard Goldstein

■ Appellant Goldstein is an attorney licensed to practice law in the State of Maryland and the District of Columbia. His primary business office is in Maryland, and the events recited herein occurred in Maryland except as otherwise noted. The events leading to his three convictions occurred in late 1975 and early 1976, and involved the placement of three infants, referred to at trial as Baby Doe, Baby Roe and Baby Poe, with three married couples, referred to, respectively, as the Norths, the Wests, and the Souths. The natural mothers, as well as the Norths and the Wests, were all residents of Maryland. The Souths resided in Virginia.

Each of the natural mothers was a patient of Dr. Stave or Dr. Rose,[9] associates in the practice of obstetrics and gynecology in Maryland and private attending physicians at the Washington Hospital Center in the District of Columbia. Goldstein and Dr. Stave, although once acquainted, had had no contact for several years when Dr. Stave called Goldstein in late 1975. Dr. Stave advised Goldstein that one of his patients, Miss Doe, was expecting a child and wished to privately place the child for adoption. Goldstein responded to Dr. Stave's inquiries that private placements were legal in Maryland and that he, Goldstein, would be willing to assist in such a placement. Subsequently, Dr. Stave contacted Mr. and Mrs. North, who had been his patients for infertility. In response to his inquiry, they indicated that they would like to adopt Baby Doe. After unsuccessful attempts to obtain a satisfactory recommendation of an attorney to assist them in the adoption, the Norths obtained Dr. Stave's recommendation of Goldstein. The Norths thereafter retained Goldstein to assist in the proposed adoption.

Upon the recommendation of Dr. Stave, Miss Doe went to the Washington Hospital Center for delivery of her baby. Goldstein arranged with the staff neonatologist to assure confidentiality of the identity of Baby Doe's mother by covering the baby's crib identification with the name "Goldstein." Similarly, all hospital billing accounts were maintained in Goldstein's

8. Section 32–782 provides in pertinent part:

Any *person* . . . that receives or accepts a child . . . and places . . . such child for . . . permanent care in a family home other than that of a relative . . . shall be deemed to be maintaining a child-placing agency. No child-placing agency shall be maintained in the District of Columbia without a license . . . . [Emphasis added.]

9. Drs. Stave and Rose were codefendants of Goldstein in this case. Dr. Rose was acquitted of all charges. Dr. Stave was convicted of two counts of violating § 32–785 but did not appeal.

name and paid out of an escrow fund established through him by the Norths. On the day of Baby Doe's birth, Goldstein secured from a Maryland court a temporary custody decree authorizing the Norths to take custody of the child. (Goldstein had visited Miss Doe and her parents at the hospital for the purpose of obtaining their signatures on various documents related to the Maryland adoption proceedings.) When the child was able to be released from the hospital, the staff instructed the Norths on the care of the child and released the child to them. Thereafter the Norths adopted the child in accordance with Maryland procedures.

The second placement also was initiated through Dr. Stave, who advised Goldstein that his patient, Miss Roe, wished to place her expected child for adoption. Miss Roe had indicated to Dr. Stave that each of the adoption agencies she had spoken with wanted her to be sent away from home during her pregnancy but that she wanted to remain at home. Dr. Stave asked Goldstein whether he knew of anyone interested in adopting the expected child. Goldstein advised a rabbi of the situation and the rabbi, in turn, advised the Wests, who retained Goldstein to assist in the placement.

When Goldstein was advised by Dr. Stave that Baby Roe had been born at Washington Hospital Center, he arranged to meet Miss Roe and her mother at the hospital to obtain their signatures on various legal documents. He then obtained an order of temporary custody for the Wests. When Baby Roe was able to be released from the hospital, Goldstein was unavailable and therefore sent an associate to the hospital. The hospital bills were paid from an escrow fund established by Goldstein for the Wests. A hospital nurse released the baby to Miss Roe's mother who, in turn, gave the baby to Mrs. West.[10] Thereafter the Wests adopted the child in accordance with Maryland procedures.

The third placement was initiated by Dr. Rose, whose patient, Miss Poe, desired to privately place her expected child. When Miss Poe began with unanticipated suddenness to deliver her child at home, Dr. Rose directed that she be taken to the Washington Hospital Center, where Baby Poe was born. The next day Dr. Rose contacted the Souths, whom he knew to be interested in adopting a child. They asked Dr. Rose to recommend an attorney; he recommended Goldstein but indicated that they need not use his services. Contacted by the Souths, Goldstein advised them to retain a Virginia attorney (since their proposed adoption would have to be processed in Virginia) but finally agreed to assist them. (This was the first time Goldstein had heard of Miss Poe or Baby Poe.) Goldstein arranged for the hospital bill to be transferred to his name and paid the bill from an escrow account established by him for the Souths. He met the Souths at the hospital, where they were instructed in the care of the child by the hospital staff. The child was released to its maternal grandfather, Mr. Poe,[11] who gave the child to Goldstein. Goldstein, in turn, gave the child to the Souths. The Souths returned to Virginia with the child and petitioned a Virginia court for adoption. At the time of trial, the Virginia court had entered an interlocutory decree of adoption.

At the outset it is acknowledged that the facts of this case appear, at least in their broadest outlines, to have some similarity to those of Galison's case. Both Goldstein and Galison attempted to place the children of unmarried expectant mothers, domiciled outside the District, who gave birth to their children in the District. In each case, a non-resident attorney participated in dealings between the natural and the adopting families and the hospital. Additionally, both cases present evidence of some child-placement activity being conducted by the defendants within the District.

---

10. As discussed, *supra* note 4, Miss Roe's mother would also be subject to prosecution under the Baby Broker Act (§ 32–782) if the government's argument prevailed that a geographical presence constitutes sufficient District interest to actuate the Baby Broker Act.

11. Under the government's geographical presence theory, Mr. Poe would also be subject to prosecution. *See supra* notes 4 and 10.

The dissimilarities distinguishing the two cases, however, are stark. With reference to Goldstein's placements, the mothers' presence in the District was due to medical reasons—to enter the hospital for delivery. In Galison's case, the mother did not come to the District solely for medical reasons nor, in fact, when she changed her mind about giving away her child, did she desire to remain in the District. Far from having made up her mind to give away her child, the mother in Galison's case consistently expressed to Galison her desire not to go through with the adoption plan. Furthermore, there exists no indication that Goldstein, like Galison, negotiated with the mothers in an attempt to persuade them to relinquish their parental rights over the children. On the contrary, Goldstein's contacts with the natural mothers and with the hospital personnel in the District were limited to carrying into effect the unchanged decisions arrived at by the natural mothers previous to entering the District and subsequent to consulting with their physicians in Maryland.

In short, these cases involve lawful Virginia or Maryland adoptions of children born to Maryland residents while in a District of Columbia hospital solely for medical reasons. The decision to place the child was made by each of the natural mothers before entering the District. The mothers evidenced no reluctance to follow their predetermined course after entering the District. Since the mothers were not residing in the District and no coercive activity was employed in an attempt to persuade them to relinquish their children, the District interests which were offended by Galison are not threatened here. Finding no other District interest threatened by Goldstein's conduct, we hold that the Baby Broker Act is inapplicable in his case.

The government argues, however, that the District has an interest in regulating Goldstein's conduct in order to protect children (and their mothers) whose presence in the District is merely for medical care. In the circumstances proved in this case, we disagree. The government's asserted nexus, mere presence within the geographical bounds of the District, arose solely by reason of the mothers' or the doctors' decisions to utilize the medical facilities of the Washington Hospital Center. Such presence, without more, is a fortuity in which the District's interests under the Act are not affected. We think that whatever the District's interest may be in these mothers giving birth to children in D.C. hospitals, it could not have been intended by Congress to override the interests of expectant mothers and their physicians in assuring that both the mothers and their children receive the best medical care available to them in this multi-jurisdictional metropolitan area.[12] Cf. Memorial Hospital v. Maricopa County, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974) (one year of residence requirement for free medical care at county hospital violated constitutional rights of equal protection and interstate travel).

To hold otherwise on these facts would be antithetical not only to the medical judgment of the doctors in these cases but also to uniform public policy respecting anonymity in adoptions and prompt transfer of custody after birth. Congress cannot fairly be taken to have intended to introduce such serious questions of comity in these cross-jurisdictional births and adoptions. Goldstein persuasively argues, without refutation by the government, that in two adoptions the appellant came into the District with Maryland court orders granting temporary custody to the adopting parents. Pursuant to Maryland practice, such court orders are ordinarily issued on the date of the infant's birth so that the infant can be physically transferred to the adopting parents as soon as practicable after birth. This is sound medical (pediatric) practice and avoids traumatizing the natural mother by making contact between the natural mother

---

12. Dr. Stave's testimony was that he considered the Washington Hospital Center to have the best facilities for the delivery of infants in this area.

and infant unnecessary.[13] The attorney's role, under Maryland practice, in executing the order granting temporary custody to the adopting parents and at the same time in preserving the anonymity of the parties would be substantially restricted were we to hold that the statute in question reached the conduct charged.

We hold, therefore, that Goldstein's conduct did not violate § 32–785.[14] No district interest sought to be protected by the Act was threatened by Goldstein's placement activities.

*No. 12196 is affirmed.*

*No. 12439 is reversed and remanded with instructions to enter a judgment of acquittal.*

KERN, Associate Justice, concurring in part and dissenting in part:

I agree with the majority's conclusion that appellant Galison's conviction should stand, but I cannot agree that appellant Goldstein's "conduct was not of the type intended to be prohibited by the Act." (at 1265). Therefore, I disagree with its conclusion that his conviction should be reversed.

First, let us examine what conduct the so-called Baby Broker Act proscribes. Section 32–785 mandates in pertinent part:

No person other than the parent, guardian, or relative . . . and no . . . agency . . . other than a licensed child-placing agency, may place or arrange or assist in placing or arranging for the placement of a child under sixteen years of age . . . for adoption.

Next, we review the conduct engaged in by appellant Goldstein which undergirds his conviction by the trial court sitting without a jury. The majority concedes (at 1270, 1271), that "both cases [appellant Galison and appellant Goldstein] present evidence of some child-placement activity being conducted by the defendants within the District."[1] The majority specifically describe the child-placement activity of appellant Goldstein as follows:

Dr. Stave advised Goldstein that one of his patients, Miss Doe, was expecting a child and wished to privately place the child for adoption. Goldstein responded . . . he, Goldstein, would be willing to assist in such a placement. . . . [at 1269.] The Norths thereafter retained Goldstein to assist in the proposed adoption.

. . . Goldstein arranged with the staff neonatologist to assure confidentiality of the identity of Baby Doe's mother by covering the baby's crib identification with the name "Goldstein." Similarly, all hospital billing accounts were maintained in Goldstein's name and paid out of an escrow fund established through him by the Norths. . . . (Goldstein had visited Miss Doe and her parents at the hospital for the purpose of obtaining their signatures on various documents related to the Maryland proceedings.) . . . [at 1269, 1270.]

The second placement also was initiated through Dr. Stave, who advised Goldstein that his patient, Miss Roe, wished to

13. Indeed, there may be a question whether Goldstein would not be subject to disciplinary and malpractice charges in Maryland brought by his clients, the natural mothers, if he had failed to maintain the anonymity of both the natural and adopting parents by arranging to have the hospital bills put in his name and by participating in the actual transfer of the children from the natural to the adopting parties.

14. We also note that the welfare of the children was not compromised nor overlooked by any party in the instant case. Each of the infants was lawfully adopted or was to be adopted by its respective adopting parents. The adoption procedures followed were performed in conformity with the laws of the respective states

of the adopting parents. The best medical care available, at least in the minds of the natural mothers and their attending physician, was provided to the infants and their mothers. Not even the slightest hint of inadequate concern for the infants' welfare is found in the record. On the contrary, it appears that in each case, Goldstein and the natural and adopting parties followed circumspectly procedures which indicate that they had the best interests of the infants in mind.

1. The applicable statute forbids maintaining a child-placing agency in the District unless licensed, D.C. Code 1973, § 32–782, which appellants were concededly not.

place her expected child for adoption. . . . [T]he Wests . . . retained Goldstein to assist in the placement. [H]e [Goldstein] arranged to meet Miss Roe and her mother at the hospital to obtain their signatures on various legal documents. . . . [at 1270.] When Baby Roe was able to be released from the hospital, Goldstein was unavailable and therefore sent an associate to the hospital. The hospital bills were paid from an escrow fund established by Goldstein for the Wests. [at 1270.]

The third placement was initiated by Dr. Rose, whose patient, Miss Poe, desired to privately place her expected child. . . . [H]e recommended Goldstein . . .. Contacted by the Souths, Goldstein . . . finally agreed to assist them. . . . Goldstein arranged for the hospital bills to be transferred to his name and paid the bill from an escrow account established by him for the Souths. He met the Souths at the hospital, where they were instructed in the care of the child by the hospital staff. The child was released to its maternal grandfather, Mr. Poe, who gave the child to Goldstein. Goldstein, in turn, gave the child to the Souths. [at 1270.]

Then, we turn to the conclusion by the trial court which *rejected* the argument by appellant Goldstein that his conduct was not subject to the Baby Broker Act. Judge Belson, who heard the testimony and rendered the guilty verdict, concluded:

. . . [a codefendant] and Attorney Goldstein [appellant] had substantial contacts with the District of Columbia and . . . their activities in the District were necessary to the eventual placement of the infants. Although the natural and adopting parents were not domiciled in the District, much of the arranging for placement and the actual transfer of the infants did occur in the District of Columbia. *It would be a severe and unwarranted limitation of the statute to hold that it does not prohibit the acts found to have been performed by Attorney Goldstein and [the codefendant]. Such a holding could render the statute a virtual nullity in cases in which natural and adopting parents reside in other jurisdictions.* [Emphasis added.]

We re-examine what this court has said concerning the role of an attorney in assisting with adoption proceedings pursuant to the Baby Broker's Act. Some 30 years ago, in *Goodman v. District of Columbia*, D.C. Mun.App., 50 A.2d 812 (1947), Chief Judge Cayton, writing for the court which affirmed the conviction of a practicing lawyer for violation of the Act, stated:

Congress therefore decreed that commercial agents, baby brokers, and even the best-intentioned citizens serving upon a non-commercial basis and from the most humane motives, must none of them be permitted to place children for adoption unless previously investigated, found qualified, and licensed. . . .

To emphasize that purpose Congress in the plainest language made it unlawful for anyone not licensed to "place or arrange or assist in placing or arranging for the placement" of a child.

What the appellant did is very clear. He "arranged" and "assisted" in placing and personally consummated the placement of the child. He was the intermediary who produced the prospective adopters and arranged contact (indirect though it was) with the mother. He it was who presented to the mother the document for release of her child and obtained her signature. He it was who arranged for the presence of the adopting parents at the hospital. And he it was who performed the final act of placement by accepting the child from the arms of its mother and physically handing it over to the adopting father. It would be difficult to imagine a more clear-cut infraction of the letter as well as the spirit of the law.

\* \* \* \* \* \*

We think it plain that so long as the lawyer gives only legal advice; so long as he appears in court in adoption proceedings, representing either relinquishing or adopting parents; so long as he refrains

from serving as intermediary, go-between, or placing agent; so long as he leaves or refers the placement of children and the arrangements for their placement to agencies duly licensed, he is within his rights under the statute. If that were all this appellant had done his conviction could not stand. It is plain he has done much more. Blameless though he is by ordinary standards of professional ethics, he has run afoul a statute which declares his actions malum prohibitum. [*Id.* at 814–15.]

In 1959, this court was called upon in *Anderson v. District of Columbia,* D.C.Mun. App., 154 A.2d 717 (1959), to review the conviction of a lawyer for violating the Baby Broker Act. We entered an affirmance, saying:

[T]he adopting mother called appellant, reciting what had happened, and requested him to handle the matter. Appellant agreed and told her he would pick her up at a street corner near the bank. . . The adopting mother withdrew $150 from her bank account and met appellant as planned. In his car at that time were his wife, a notary public of the State of Maryland, and Mrs. Petro.

The party went to the home of the natural mother, leaving the adopting mother in the automobile. After some conversation, the child was given to Mrs. Petro and the party drove to the doctor's office. Following a satisfactory examination, they returned to the natural mother's home, again leaving the adopting mother in the car. Appellant presented the natural mother with a paper identified as a "consent to adoption," which she and her husband signed and acknowledged in the presence of appellant's wife, the notary public. The natural mother told appellant she was in financial difficulty and he said, "I'll contact the adopting mother and see what I can do for you." He left the house and a short time later returned with $50, obtained from the adopting mother, which he gave the natural mother, remarking, "This is a loan." The adopting mother was then given the child and the parties returned to their respective homes. [*Id.* at 717–18.]

Judge Quinn emphasized in his opinion for the court what we had said in *Goodman* concerning the appropriate role for a lawyer under the Act:

[S]o long as he refrains from serving as an intermediary, go-between or placing agent . . . he is within his rights under the statute. . . . [*Goodman v. District of Columbia, supra* at 815.]

Again, in 1963, a practicing lawyer appealed his conviction for violating the Act and this court affirmed. *Dobkin v. District of Columbia,* D.C.App., 194 A.2d 657 (1963). We stated:

The evidence against appellant was that a woman expecting a child contacted him and asked for help in placing the child for adoption; that appellant later called the expectant mother informing her that a couple from New York, who were interested in adopting her baby, would be in town and he arranged a meeting between them; that the New York couple gave him money to be used in supporting the expectant mother; that when the baby was born the mother contacted appellant who went to the hospital and had her sign adoption papers he had prepared; that appellant and the couple escorted the mother and the baby from the hospital, and the couple then took the child with them and the mother went home. . . . It is apparent that appellant's course of dealing showed him to be in violation of the statute and justified a conviction. [*Id.* at 658.]

Finally, we look at the reason the majority employs for holding the Baby Broker Act inapplicable to what it concedes was child-placement activity by appellant Goldstein:

Since the mothers were not residing in the District and no coercive activity was employed in an attempt to persuade them to relinquish their children, the District interests which were offended by Galison are not threatened here [and] no other District interest [is] threatened by Goldstein's conduct. [at 1271.]

I submit that Judge Belson's rejection of appellant Goldstein's argument, embraced now by the majority, was required by the Act and consistent with our prior decisions. The reversal of his conviction is that very action Chief Judge Cayton urged this court to eschew: "the process of erosion by judicial construction" which "before long . . . would be complete and the Act ineffective." *Goodman v. District of Columbia, supra* at 814. Accordingly, I must respectfully dissent.