## PEOPLE v KEANE

Docket No. 76660. Submitted March 21, 1985, at Lansing.—Decided July 1, 1985. Leave to appeal applied for.

Defendant, Noel P. Keane, was charged with illegal placement of a child for purposes of adoption and offering and giving money for such placement. The charges arose from an attempted adoption, arranged by defendant, of a newborn child of a minor, unemancipated, unwed mother by a California couple. The child was turned over to the prospective adoptive parents when the mother and child were released from the hospital. The actual adoption was to be accomplished through a California court. When the mother changed her mind and demanded the return of her child, defendant facilitated such return. The 46th District Court, Clarence A. Reid, Jr., J., dismissed the charges, holding that the Michigan Adoption Code, under which defendant was charged, did not apply to an out of state adoption. The people appealed to the Oakland Circuit Court, which affirmed, John N. O'Brien, J. The people appealed by leave granted. *Held:*

1. The Michigan Adoption Code prohibits placing a child in a home for adoption until entry of an order terminating parental rights regardless of where the placement is to occur. Direct consent adoptions, such as the one attempted here, are prohibited. The actions of the defendant constituted a violation of the Adoption Code, and the lower courts erred in dismissing the charge of illegal placement of a child.

2. The charge of offering and giving money for such placement was properly dismissed because the adoption was to have taken place in California, and any charges and fees expended by the defendant in connection with the adoption would have had to be approved by the California court, not by a Michigan court.

Reversed in part, affirmed in part.

REFERENCES FOR POINTS IN HEADNOTE

Am Jur 2d, Adoption §§ 23-47, 83-90.

Validity of state statute providing for termination of parental rights. 22 ALR4th 774.

ADOPTION — TERMINATION OF PARENTAL RIGHTS — DIRECT CONSENT ADOPTION.

The Michigan Adoption Code prohibits placing a child in a home for the purpose of adoption until an order terminating parental rights has been entered, without regard to whether the placement is to be in Michigan or in another state; direct consent adoptions are generally prohibited (MCL 710.41; MSA 27.3178[555.41]).

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *L. Brooks Patterson,* Prosecuting Attorney, and *Thomas S. Richards,* Assistant Prosecuting Attorney, for the people.

*Robert S. Harrison,* for defendant.

Before: DANHOF, C.J., and R. B. BURNS and G. R. DENEWETH,* JJ.

R. B. BURNS, J. Defendant was charged with illegal placement of a child for purposes of adoption, contrary to MCL 710.41; MSA 27.3178(555.41), MCL 710.69; MSA 27.3178(555.69), and offering and giving money for such placement, contrary to MCL 710.54; MSA 27.3178(555.54), MCL 710.69; MSA 27.3178(555.69). The 46th District Court granted defendant's motion to dismiss the charges and the Oakland County Circuit Court affirmed the district court's ruling. The people appeal by leave granted.

The following statement of facts has been extracted from a joint statement of facts to which the parties have stipulated. In January, 1982, Trisha Shearer of Clarkston, Michigan, was an unwed, pregnant, 15-year-old, unemancipated minor. Trisha's mother, Judy Wood, contacted defendant, an attorney, and asked him to set up the adoption of her expected grandchild. In January of

---

* Circuit judge, sitting on the Court of Appeals by assignment.

1982, Judy Wood and Trisha Shearer met defendant at his office. Trisha states that defendant told her that the adopting parents would pay for all her medical bills and her stay at Marillac Hall, a home for unwed mothers. Trisha entered Marillac Hall on January 26, 1982. Defendant paid for Trisha's stay through his client trust account, on behalf of Marvin and Sandra Barsky, a California couple.

On March 22, 1982, Trisha entered Providence Hospital in Southfield and gave birth to a daughter. Judy Wood notified defendant of the birth. On March 24, 1982, defendant came to the hospital with the Barskys, but he met with Trisha Shearer alone. He presented her with certain forms,[1] which she signed. Trisha alleges that she did not know what the forms were but believed them to be medical forms. Judy Wood was not present at the time nor did she ever sign any forms. During Trisha's stay at Providence Hospital, the Barskys came to the hospital and visited with her and the baby. The Barskys gave Trisha clothing for the child. Extra food and water were requested to be provided for the child at the time of discharge because the Barskys planned to fly the child directly to California.

On March 25, 1985, the day Trisha and the baby were to be discharged, Judy Wood met defendant at the hospital. Defendant presented a check to Providence Hospital for $1,400 towards Trisha's hospital bill, promising to pay the balance upon receipt of a bill. Judy Wood claims that Trisha

[1] The record in this case includes copies of the forms signed by Trisha dated March 24, 1982. They are: (1) a form headed "Superior Court of State of California" and is a "Consent to Adoption by Parent Outside California", (2) a form headed "Declaration of Paternity" in which the putative father is named, (3) an authorization form for the release of the medical, psychological, psychiatric and health records of Trisha and the baby, and (4) a form giving Medical and Surgical Authorization to the Barskys for the child.

told her that she did not want to go through with the adoption and wanted to keep her baby and Judy reported this to defendant. Defendant denies this and alleges that Judy Wood handed him a signed authorization to release the birth certificate.

When Judy Wood and defendant arrived at the exit of the hosptial, Trisha, her child, Ruby Rice (Trisha's aunt), Erlene Farley (a nurse), and the Barskys were waiting. Trisha was upset and crying heavily. She handed the child to nurse Farley so she could get in the car. Nurse Farley reports that as she held the child, defendant came up behind her and said, "Give me the baby, give me the baby". Defendant states that he simply informed the nurse, "There is going to be an adoption in this case", and reached out and took the baby from the nurse. Nurse Farley says that the transfer of the child was "smooth and quiet". It is undisputed that defendant took the baby and handed her over to the Barskys. The Barskys left immediately for the airport and flew the child to their home in California.

Judy Wood said nothing; she entered her vehicle with her daugher and Ruby Rice and left. She drove to Marillac Hall to get advice on how to recover the child. Judy Wood alleges that she called defendant that evening and told him that Trisha was very upset and wanted her baby back. She claims that defendant said, "What you tell your daughter is that it is really out of my hands, the couple is in California, you would have to contact their attorney in California, and the best suggestion I could give you is that your daughter needs to see a psychiatrist". Defendant denies this alleged phone call occurred and indicates that he was contacted by Judy Wood on a later date and that he stated he would help to return the child to

Trisha. Subsequently, defendant facilitated the return of the child to Michigan and to the custody of Trisha Shearer.

Prior to the birth of the child, defendant made certain financial arrangements with Judy Wood and Trisha Shearer. They agreed that expenses to be incurred in connection with the birth of the child be paid by the Barskys through defendant.

Defendant was first charged with violating § 41 of the Michigan Adoption Code, MCL 710.41; MSA 27.3178(555.41), which states in pertinent part:

"(1) A child shall not be placed in a home for the purpose of adoption until an order terminating parental rights has been entered * * *"

The penal provisions for violating § 41 are found in § 69 of the Michigan Adoption Code, MCL 710.69; MSA 27.3178(555.69), which provides:

"A person who violates any of the provisions of sections 41 and 54 of this chapter shall, upon conviction, be guilty of a misdemeanor, and upon any subsequent conviction shall be guilty of a felony."

The district court agreed with defendant and held that § 41 of the Michigan Adoption Code did not apply to this case. The court stated:

"[T]his child was only handed over to the people for placement in a California home for adoption through a California court.

"The letter, intent and spirit of the Michigan Adoption Code as presently written[2] covers only Michigan

---

[2] At the time defendant was charged, Michigan had not yet adopted the Interstate Compact on the Placement of Children. Immediately effective May 29, 1984, our Legislature enacted this compact, 1984 PA 114, MCL 3.711; MSA 4.146(11). In Article V thereof, devoted to retention of jurisdiction, the initial paragraph commences:

adoptions in this Court's opinion and not interstate or out of state adoptions."

The people contend that homes do not adopt children; people adopt children, and § 41, while using the word "home", must be logically interpreted to include the placement of a child with persons for the purpose of adoption. This construction, the people argue, is consistent with the legislative purpose in enacting this provision within the context of the Michigan Adoption Code.

First, it appears to us that in order to reach its decision the district court read into § 41 the word "Michigan" before the word "home" and the word "adoption". We see no reason to construe a statutory limitation based on words that are not there. On its face, § 41 prohibits placing a child in a home for the purpose of adoption until an order terminating parental rights has been entered regardless of where the placement occurs.

One of the stated purposes of our Legislature in adopting the Michigan Adoption Code is set forth in § 21a of the statute, MCL 710.21a; MSA 27.3178(555.21a):

"(b) To provide procedures and services which will safeguard and promote the best interests of each adoptee in need of adoption and which will protect the

"The sending agency shall retain jurisdiction over the child sufficient to determine all matters in relation to the custody, supervision, care, treatment, and disposition of the child which it would have had if the child had remained in the sending agency's state, until the child is adopted, reaches majority, becomes self-supporting, or is discharged with the concurrence of the appropriate authority in the receiving state. Such jurisdiction shall also include the power to effect or cause the return of the child or its transfer to another location and custody pursuant to the law."

"Sending agency" as defined in the Article II definitional provisions includes "a person" who "send, brings, or causes to be sent or brought any child to another party state". Thus, it may be that the issue presented in this case will not arise again.

rights of all parties concerned. If conflicts arise between the rights of the adoptee and the rights of another, the rights of the adoptee shall be paramount."

The code specifies procedural safeguards designed to protect the rights of all concerned, including provisions aimed at protecting the rights of a minor parent in making the decision to allow permanent adoption of a child. See *e.g.*, MCL 710.28(2); MSA 27.3178(555.28)(2), MCL 710.43(4); MSA 27.3178(555.43)(4).

Under the code, direct consent adoptions, with certain limited exceptions inapplicable here, are prohibited. Private parties, including lawyers, can no longer act as middlemen between the biological mother and the adopting parents. Only licensed private agencies, the Department of Social Services or the probate court can arrange and approve adoptions.

This case involves a child born in Michigan of a Michigan mother, and a Michigan putative father. The grandparents are residents of Michigan. All of the discussions between the expectant mother and the defendant, a member of the State Bar of Michigan, occurred in Michigan. All of the papers and documents were signed in Michigan. Money was offered by and paid for the benefit of the expectant mother in Michigan in connection with the prenatal care and delivery of the child in Michigan. The baby was handed over to the adopting couple in Michigan. Under these circumstances, we cannot accept the district court's ruling that the State of Michigan has no interest in this case. Accordingly, we hold that the actions of defendant constitute a violation of § 41 of the Michigan Adoption Code, despite the fact that the actual adoption was to take place in California. We note that other jurisdictions have reached

similar conclusions under their statutes. See *e.g.,*
*Goodman v District of Columbia,* 50 A2d 812 (DC
App, 1947); *State v Segal,* 78 NJ Super 273; 188
A2d 416 (1963).

Defendant was also charged with violating § 54
of the Michigan Adoption Code. It reads, in perti-
nent part, as follows:

"(1) Except for charges and fees approved by the
court, a person shall not offer, give, or receive any
money or other consideration or thing of value in
connection with any of the following:

"(a) The placing of a child for adoption.

"(b) The registration, recording, or communication of
the existence of a child available for adoption or the
existence of a person interested in adopting a child.

"(c) A release.

"(d) A consent.

"(e) A petition.

"(2) Before the entry of the final order of adoption,
the petitioner shall file with the court a sworn state-
ment describing money or other consideration or thing
of value paid to or exchanged by any party in the
adoption proceeding, including anyone consenting to the
adoption or adopting the adoptee, any relative of a
party or of the adoptee, any physician, attorney, social
worker or member of the clergy, and any other person,
corporation, association, or other organization. The
court shall approve or disapprove fees and expenses.
Acceptance or retention of amounts in excess of those
approved by the court constitutes a violation of this
section." MCL 710.54; MSA 27.3178(555.54).

Section 22(h) of the Michigan Adoption Code de-
fines "court" as "the probate court of this state,
and when the context requires, the court having
jurisdiction over adoption in another state or coun-
try". Thus it would appear that a California court
could have been the court to approve the charges
and fees expended by defendant in conection with

the proposed adoption in this case. The California courts require an accounting of all disbursements made in connection with adoption, similar to that required by § 54 of the Michigan Adoption Code. See California Civil Code § 224r.

Defendant argues that, since the full disclosure requirements of the California Civil Code and the requirements of § 54 of the Michigan Adoption Code are so similar, no violation of § 54 of the Michigan Adoption Code may be charged and count II was properly dismissed. We agree.

Reversed in part, affirmed in part.